IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHLOE NOFTZ, on behalf of      ) Case No. 24 C 8100
themselves and all others      )
similarly situated, et al.,    )
                               )
                  Plaintiffs,  )
          v.                   )
                               )
KSB HOSPITAL FOUNDATION,        )
doing business as KSB           ) Chicago, Illinois
Hospital, formerly known as     ) September 11, 2025
Katherine Shaw Bethea           ) 1:34 p.m.
Hospital,                       )
                               )
                  Defendant.    )

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE THE HONORABLE MARTHA M. PACOLD
APPEARANCES:

For the Plaintiffs:    STRANCH, JENNINGS & GARVEY, PLLC
                       BY:  MR. MICHAEL C. TACKEFF
                       223 Rosa L. Parks Avenue, Suite 200
                       Nashville, Tennessee 37203

For the Defendant:     CHILIVIS GRUBMAN LLP
                       BY:  MR. SANJAY S. KARNIK
                       159 N. Sangamon Street, Suite 313a
                       Chicago, Illinois  60607

                       CHILIVIS GRUBMAN LLP
                       BY:  MS. BRANDI Z. BURTON-MURRAIN
                       1834 Independence Square
                       Atlanta, GA 30338

Court Reporter:        KATHLEEN M. FENNELL, CSR, RMR, FCRR
                       Official Court Reporter
                       219 South Dearborn Street, Room 2328A
                       Chicago, Illinois  60604
                       Telephone:  (312) 435-5569
                       Kathleen_Fennell@ilnd.uscourts.gov

                       *   *   *   *   *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

(Call to order.)

THE CLERK: 24 C 8100, Noftz v. KSB Hospital Foundation. If you can state your names for the record, we'll start with plaintiffs' counsel first.

MR. TACKEFF: Mike Tackeff on behalf of the plaintiffs.

MR. KARNIK: Good afternoon, Your Honor. Sanjay Karnik on behalf of defendant KSB Hospital.

MS. BURTON-MURRAIN: Brandi Burton-Murrain on behalf of KSB Hospital.

THE COURT: Good afternoon, everyone. We're here for an oral argument on the motion to dismiss.

Does anybody have anything to raise before we turn to the argument?

MR. TACKEFF: No, Your Honor.

THE COURT: Okay. So normally we'll just track the order of the briefs, so since it's the defendant's motion, we'll start with the defense. Then we'll go to the plaintiff. Then come back to the defense.

I may not have set a time limit for this or -- I think I typically would set a time limit of 30 minutes.

MS. BURTON-MURRAIN: You did, Your Honor.

THE COURT: Okay. Thanks.

Does that -- do you anticipate that working?

MR. TACKEFF: Yes.

MR. KARNIK: Yes, Your Honor.

THE COURT: Okay. Great.

And so whenever the defense is ready to begin, feel free to come up to the podium.

Also, everybody else could have a seat while someone else is arguing.

Also, just a heads up. I, of course, am going to be listening for the merits. I will also be listening for whether it would be feasible or the issues are susceptible to a ruling from the bench, either today or possibly at another time, just scheduling a ruling from the bench.

Sometimes -- I mean, sometimes I'll rule in that format as opposed to in a written ruling, and so I'll just be listening for that as well.

Thank you.

MR. KARNIK: Thank you, Your Honor. Good afternoon.

May it please the Court, my name is Sanjay Karnik appearing for the defendant.

One quick housekeeping note, Your Honor. If it's okay with Your Honor, I'll be arguing minimal diversity and the federal causes of action brought by the plaintiffs, and Ms. Burton-Murrain would argue the state law claims, which is Counts I through VII, so I'll be doing VIII to XI.

THE COURT: Okay.

MR. KARNIK: Thank you, Your Honor.

As an initial matter, Your Honor, we had raised in the middle of our motion to dismiss brief that, you know, if the federal court -- if the federal causes of action do not survive, then the Court should decline to exercise supplemental jurisdiction because there's no minimal diversity in this class action case. Every plaintiff is a citizen -- alleges to be a citizen or resident of Illinois, as is KSB Hospital.

One thing that I wanted to raise in addition to the lack of subject matter jurisdiction over the state law claims, because there is no CAFA jurisdiction in this case, the Court should dismiss all class action claims, you know, all claims on behalf of a putative class because of the lack of even minimal diversity here.

And so that's just like an additional point, Your Honor. So in other words, the only way that this -- this action should survive in the federal court would be -- is if any of the plaintiffs individually sufficiently allege a federal cause of action, and jurisdiction could only attach under 28 U.S.C. 1331.

And so we're arguing that, you know, in any event, the dismissal of class -- the Court should dismiss all class claims.

That's just another point that I wanted to raise with respect to minimal diversity. And the -- the 11th Circuit has

stated that party -- has, you know, admonished the parties they cannot merely allege diversity of citizenship without identifying the parties' state of citizenship, and the fact that the minimal diversity under CAFA is lower than the complete diversity required in most cases does not provide a basis to alter this rule.

And so the Seventh Circuit has held that -- that, you know, the failure to identify a specific class member who is a citizen of a state other than Illinois is indeed fatal to establishing CAFA jurisdiction. The two Seventh Circuit cases which establish that point would be *Dancel v. Groupon, Inc.*, 940 F.3d 381 (2019), as well as *Toulon v. Continental Casualty*, 877 F.3d 725, a 2017 Seventh Circuit case.

Those are our initial points on minimal diversity, Your Honor. What I next want to turn to is the lack of any, you know, substantive allegations brought by these three plaintiffs personally in this case.

Your Honor, first I would note that the complaint is lacking -- begins with several hypothetical and fictional allegations. I believe I left one thing, Your Honor, I'm sorry.

I apologize, Your Honor.

THE COURT: Oh, no worries.

MR. KARNIK: Oh, here we go.

My apologies.

Your Honor, the complaint is littered with numerous hypothetical and fictitious allegations which don't apply to any of the three named plaintiffs here. I'll run through them quickly because we address them in our brief as well, starting with paragraph 89 regarding an allegation of searching the word colonoscopy.

There's no specific, there's none of the three plaintiffs attached to this allegation. Paragraph 89, it states: "Upon a patient's arrival on the KSB homepage;" paragraph 90, then the patient -- "then, as the patient moved from the homepage to conduct a search for colonoscopy" and then when that section on -- when the colonoscopy allegations end, there is no end result disclosure even alleged.

So even if the Court accepted a hypothetical allegation on behalf of the named plaintiffs, there's no end result disclosure with respect to the first hypothetical, the colonoscopy allegation.

Starting at paragraph 96, Your Honor, there is a hypothetical allegation about a child birth class registration. It states that in paragraphs 97 and 98 that the Microdata event informs Facebook, allowing adding to a calendar, and that the details of the event are disclosed by Eventbrite, not by the Meta Pixel, and then again when this allegation ends at paragraph 101, there is no end result disclosure back to the -- back to the user.

The next hypothetical, Your Honor, financial activities. In paragraph 103, the complaint states that the patient clicked on PAY MY BILL ONLINE and that in Facebook -- and that the Meta Pixel allegedly informed Facebook user of that clicking action.

In paragraphs 108 and 109, it states that the disclosure went to FINANCIAL ASSISTANCE and ESTIMATE MY COST, but, again, Your Honor, there's no end result disclosure alleged back to Facebook -- or back to the user, excuse me.

No. 4, the fourth hypothetical patient, hypothetical allegation, Your Honor, is alleged patient portal activities. Paragraph, I believe, 112 -- or it's between 112 and 114, where the complaint states that -- that it was divulged that "the patient was on the patient portal page called LOG IN.

And then similarly paragraphs 115 and 118, plaintiffs allege that the patient was on a page about medical records, and that the patient clicked on an authorization form link.

But with respect to this medical records allegation and patient portal, there is no actual allegation that any of the named plaintiffs had any of their information disclosed nor is there any information that with this hypothetical patient that something that was accessed or gained from within a log in to the patient portal was -- was obtained.

And so, you know, with these hypothetical allegations, even considering them, there's nothing which reveals any

information back to the alleged, you know, fictitious user.

THE COURT: Sorry, who is the user? When you're saying the user, who --

MR. KARNIK: Yes, Your Honor. When I'm referring to the user at the end of -- for example, at the end of paragraphs 109, 101 and 93, by user, I refer to, you know, the would-be patient. In other words, that there was no -- these hypothetical allegations don't even allege what was disclosed back to the would-be patient. That's what I mean by the -- by the user, Your Honor.

THE COURT: Meaning -- well, but what was disclosed back to the would-be patient, meaning, for example, if you look at paragraph 109, you're saying there was no -- there's no allegation saying, okay, the patient clicked to estimate costs, and there's no allegation that a cost estimate was sent back to the patient, or, I guess, I -- because I thought the issue or the claims, the allegations are about, I mean, speaking at a very generic, you know, summary level, the allegations are about disclosure, alleged disclosure of patients' information to ultimately Meta using these trackers or pixels, pixel or a similar tracking tool, and so I guess what I'm -- but now you're referring to a disclosure back to the patient whose information allegedly was collected and disclosed to Meta.

So I guess that's -- I'm not totally following maybe where -- what is the significance of not -- of a failure to

allege a disclosure back to the patient.

MR. KARNIK: Okay. Yes, Your Honor.

My reading of the complaint is that they take issue with both aspects. No. 1, just the mere disclosure, but then they also rely heavily on the -- on the allegations that -- that an ad comes back to them on Facebook. That's, you know, that's -- throughout the complaint, especially in the beginning towards -- before these hypothetical allegations, they rely on the fact that -- that -- that the Meta Pixel and CAPI are allegedly programmed to put advertisements back to them.

You know, the advertisement back to the end user is a critical allegation because it -- it shows -- it reveals -- if it's true, it reveals that something was transmitted to Facebook and then the alleged -- the alleged viewing of an advertisement confirms that.

Otherwise, we're just dealing with, you know, internal clicks and cookies management, which does not reveal anything to any -- to any, you know, other third party.

I hope that explains it.

THE COURT: I think so. Let me just say it back to you so that I make sure I'm understanding though.

So I think what I'm hearing is that you're saying for these series of hypotheticals, there's no allegation that a patient who did the -- you know, clicked on certain aspects of the website or interacted with the website, received a targeted

ad in response to that patient's web activity, and that is -- if there were an allegation along those lines, that would be, you know, evidence that the information was disclosed to Meta. Without a targeted ad coming back, it's, you know, maybe less clear that any disclosure ever occurred.

It's still the disclosure that it sounds like is the alleged harm, but the receipt of the targeted ads is maybe evidence or if it were alleged, it would be evidence of a disclosure.

MR. KARNIK: That's correct, Your Honor, and not all -- and going back to the mere disclosure point, not all mere disclosures would be violative.

As I was -- as I intend to address after going through the plaintiffs' individual ones, but I can address it now basically.

The mere -- the mere alleged disclosure to Facebook that -- that a patient or someone on the KSB website has clicked on to the log-in page or has clicked on to the link to get an authorization of a medical record or the fact of any revealing of an IP address or anything on any unauthenticated page does not constitute an impermissible HIPAA disclosure.

So not -- so not all disclosures rise to the level of being, you know, allegedly unlawful, and here they don't -- the -- and that's the case here, Your Honor. The hypothetical allegations and the plaintiffs' allegations of, you know, where

they clicked without anything concrete, does not rise to the level, and certainly when there's no allegation of an end result viewing of an ad back, that's indicative of any -- of a -- that's indicative of there not being any transmission and disclosure of, you know, PHI or IIHI.

THE COURT: Okay.

MR. KARNIK: And, so those are the five hypothetical allegations, Your Honor.

Moving to patient Noftz, the patient's specific allegations do not fare any better.

With respect to plaintiff Noftz, I'll try to run through this quickly, Your Honor.

With respect to plaintiff -- with all three plaintiffs, Noftz, Weinstock and -- excuse me, Noftz, Tonya Black and Mr. Kenneth Weinstock. Looking at paragraphs 138, 149 and 161, respectively, these are just laundry lists of allegations without any supporting facts, but let's look at 138 to begin with.

Most -- many of these items are not even considered to be HIPAA-protected disclosures even if they did exist. That would be pages and content of plaintiffs' review; the seeking of medical treatment, not any actual facts of medical treatment disclosed; the status, the mere status as a patient. Plaintiff fails to explain how the status of a patient can be ascertained from merely going onto a website, especially an unauthenticated

part of a website.

Information regarding the plaintiffs' patient portal activity, importantly, that is not actual activity within the patient portal activity.

Specialties of the medical providers plaintiffs searched for and viewed. Had there -- there are some cases, Your Honor, that -- where the specialty of the doctor could give -- could give rise to a HIPAA-protected disclosure, but in this case, Your Honor, the plaintiffs have not, you know, disclosed such material. There's only one party in control of their information, and that's the plaintiffs. And if they had any allegations that -- a specific thing, they could have, you know, stated so, but then they don't.

And then, Your Honor, in the briefing, we mentioned the *AHA v. Bacerra*, Northern District of Texas case. Under that case, the plaintiff's identity via IP address is also not a HIPAA-obligated piece of protection.

And so even within the plaintiffs' sections of their specific allegations, we just have a lot of conclusory statements, the majority of which are not even protected anyway, and then in the situations where they could, these plaintiffs failed to do so.

With respect to plaintiff Noftz, she was -- she does not allege any advertisements back or any -- or any allegations that anything about a broken toe was disclosed.

Same thing with respect to plaintiff Black. She says that she located OB/GYN and primary care physicians' phone numbers, but there's nothing that says that this information was relayed back to her while on Facebook.

And, finally, Your Honor, while -- while Kenneth Weinstock says in paragraph 156 that he began to notice targeted ads for KSB Hospital pain management classes, he doesn't allege, you know, what other Internet searches he had made that perhaps could have triggered those, nor does he allege any of the specific issues of kidney stones, which he said that he went to the -- to the website to review, and specifically even though he said he went to the patient portal, you would -- one would think that if something was disclosed from within his patient portal, he would have so alleged.

And so, Your Honor, the specific allegations of the plaintiffs don't fare any better for the conclusory allegations.

Your Honor, I believe I have about -- I believe we started at 1:35, and so I have about -- I'm going to just quickly address the federal claims.

Your Honor, there was -- the plaintiff pointed out a few cases where the -- where the Wiretap Act claims survived. The difference in those cases, Your Honor, is that, for example, in *Smith v. Loyola*, the plaintiff had alleged that specific URL links, and they alleged specific medical

conditions to those specific URL links. Similar for *Aspen Dental*. In *Kurowski IV* and in *Hartley v. University of Chicago,* the plaintiff had alleged, after several attempts, that the -- that they had alleged a specific medical specialist and they had alleged a specific medical information that was transmitted which allowed them to get over the top for their claims.

So -- and then two recent -- two more recent cases, Your Honor, which I think that the Court should consider would be the dismissal of Wiretap Act claims in *Doe I v. Chestnut Health, Inc.,* from June 6th of this year 2025, Westlaw 1616635. And then also a case called *Hannant v. Sarah Culbertson Memorial Hospital,* 2025 Westlaw 2413894.

In those cases, and I'm going to go to *Hannant* specifically, that, you know, the court said: Here plaintiff's allegations of her own experience as opposed to a potential class member lacked the detail necessary to plausibly invoke the crime-tort exception via HIPAA violation.

And then quickly, Your Honor, because I know we have to address the state law claims, the law is quite clear that KSB Hospital is not an electronic communications service, thereby vitiating their -- their Counts IX and X under Stored Communications Act.

And then with respect to the Computer Fraud and Abuse Act, Your Honor, this case falls specifically within *Van Buren*

because this is -- they allege this to be a without authorization case, and the plaintiffs' other cases are an exceeded authorization.

With that, Your Honor, I will turn over the remaining arguments to my co-counsel. Thank you.

THE COURT: Okay. Thank you.

MS. BURTON-MURRAIN: Thank you, Your Honor. Again, this is Brandi Burton-Murrain on behalf of the defendant.

I'm going to jump right into Counts I and II of the plaintiffs' complaint. They allege negligence and negligence per se, Your Honor.

As you know, there are three elements of negligence, and, of course, it is our position that the defendant didn't owe any duty, and that's the major issue that's fatal here. There was no duty owed to the plaintiff.

But I just want to take a step back. My argument is going to break up negligence per se versus the common law negligence, Your Honor.

And as Your Honor is -- you're aware, common law is derived from judicial decisions. So here, Your Honor, plaintiffs' common law claim has to fail because there's no common law, specifically in Illinois does not recognize a duty to safeguard personal information.

And, Your Honor, my co-counsel noted the *Chestnut Health* case that was just decided June 6th in the Central

District. Your Honor, and I -- there, the court found that this was fatal.

Neither the Seventh Circuit nor the Illinois Supreme Court has recognized that there's a common law duty to safeguard this information that's at issue specifically in this case, Your Honor.

So accordingly, we believe that Count I of the complaint must fail, Your Honor.

However, if Your Honor does find that there is a duty, in addition to our -- my previous argument, we also believe that it was not breached. Plaintiffs discuss Meta Pixels and the technology, how it works, goes into great length in the complaint. However, it does not adequately plead that KSB's system was conformed in a way that could track and disclose the information as they allege, Your Honor.

So in addition to our initial claim that -- our initial position that there's no duty, there's also no breach of this alleged duty, Your Honor. And as the Court also knows, breach, there has to be a proximate cause related to the injuries, Your Honor.

And I'm going to address this at the end because it applies to both the negligence and the negligence per se count, Your Honor.

So now I'm going to jump on over to the negligence per se count, Count No. II. And, Your Honor, when it comes to

negligence per se, in Illinois, there has to be a violation of a statute or ordinance that is designed to protect human life or property. It has to be a *prima facie* case -- I'm sorry. There's -- designed to protect human life or property is *prima facie* evidence of negligence, but only per se if the legislature clearly intend for the act to impose strict liability, Your Honor.

And the plaintiffs moved forward with the negligence per se count pursuant to a flurry of statutes and positions. They cite the Federal Trade Commissions Act, HIPAA, HIPAA pro rule, the Illinois Medical Patient Rights Act, the Illinois Personal Information Protection Act, and I'll take each of them briefly by themselves.

First the FTC act and HIPAA. In HIPAA, they were both -- neither were intended to impose strict liability, and, again, Your Honor, and not to keep harping back, but just three months ago a court in Central District found that this was fatal to the plaintiff's argument who literally pled the exact same pleadings, nearly identical, Your Honor, to the ones that's before the Court.

That's specifically because FTC Act and HIPAA, they were not intended to impose strict liability, that there can't -- it can't be negligence per se, Your Honor. And this also is the same for MPRA and the PIPA. The statutory text of those statutes, they do not provide -- they do not support that

the legislature intended to impose strict liability, Your Honor, which we find fatal to this negligence per se claim, Your Honor.

And, again, Your Honor, just looping back, even if the Court did not -- does not agree with that position, we find that both Counts I and II will have to fail because there's no injury -- there's no injury proximately caused by this alleged breach.

First, plaintiffs -- they do not sufficiently allege what was lost. You can look at the complaint, Your Honor, as I'm sure you've already done, and they say plaintiffs will be injured or may be injured or imminently injured in the future, but there's no specific allegation of what was lost, what loss was incurred, Your Honor.

But even more so, when it comes to an allegation of -- in Illinois, when it comes to an allegation of economic loss, Illinois economic loss rule bars recovery for purely economic loss, and we cite this in the motion, Your Honor, *Moorman* case, the *Moorman* case, and it just explains that tort law affords remedies for losses arising from personal injury or damages, whereas contractual law provide for -- is the appropriate remedy for economic -- economic losses stemming from commercial expectation related to injury to a person or property, Your Honor.

And this, the pure -- per Illinois law, the pure

economic loss cannot -- cannot -- it's not sufficient to -- to state a loss pursuant to this tort that they're alleging. And when I say their, of course, I'm talking about the plaintiffs, Your Honor.

I'm going to jump over to Count VII, which is the Illinois Eavesdropping Act, Your Honor.

Now, first, it is our position that we have to guess what section of the Illinois Eavesdropping Act that plaintiffs are alleging that we violated. And for that reason alone, we believe that this count should be dismissed, Your Honor.

However, what it appears to be is it's a combination of language from various sections and specifically from (a)(2), there's a -- which we believe is inapplicable, they combine the language of private conversation and private electronic communication.

Under the Illinois Eavesdropping Statute, private conversation is defined. It's defined as any oral communication between two or more persons. Your Honor, we know based off the allegations in this complaint that plaintiffs aren't alleging that there was an oral communication. So if they are, in fact, alleging that this is how the eavesdropping statute was violated, it should be dismissed, Your Honor. Again, case law, recent case law supports that.

Now, just circling back to if they are speaking from a separate part of the statute where it talks about private

electronic communication, (a)(3) would be applicable. But it also fails to -- it also fails because, as the plaintiffs have conceded throughout their complaint, KSB was a party to the private electronic communication.

Accordingly, they can't -- there was no eavesdropping of a conversation you are a part of, Your Honor. So we find -- we ask the Court find that plaintiffs' Count VII for eavesdropping also fails, Your Honor.

Jumping around again to Counts III and IV, both varying breach-of-contract claims. Your Honor, we find -- it's our position that there's no valid or enforceable contract. Now, we do recognize in plaintiffs' complaint that, you know -- and we agree that there is a relationship between a patient and its provider, a patient and its hospital.

However, that is totally different than the allegations that are being alleged here, Your Honor. Even if we agree that there's a relationship between a patient or hospital in -- that does not mean that there is somehow a contract regarding going onto the website, a website you don't have to frequent, to be a patient. There's no -- plaintiffs -- unless I don't believe I've missed it, they have not alleged that you have to go on a website to be a patient at KSB Hospital. It's simply not how it works, Your Honor.

So even if it was a contract, that doesn't mean that the contract is just for everything that could possibly arise

under the sun, Your Honor.

So we ask that the Court find that this -- that this, Counts III and IV also fail because there's no enforceable contract. However, even if there was an implied contract, there's no injury in fact here. And there can't be a breach without an injury, Your Honor. That's established in Illinois case law, so there's no measurable or actual injury here, and for that reason as well, we believe that Counts III and IV should be dismissed, Your Honor.

And also Count V which is unjust enrichment, it kind of meshes with the Counts III and IV. The plaintiffs plead this in alternative to those counts, so instead of -- I won't rehash the analysis, Your Honor. For the same reasons that I stated regarding the breach of contract, unjust enrichment should also be dismissed.

And then finally, Your Honor, Count VI, bailment, there's no viable theory in data breach cases for bailment. I believe the language -- and I'm -- this is not verbatim, for the most recent ruling in the Central District that I mentioned, they said federal court is not the place to get innovative with legal theories, and that's exactly what plaintiffs are trying to do here, Your Honor.

There's no express or implied agreement to create a bailment. There's no delivery of property between a bailee, and there's no redelivering or accepting of any property, and

there's no allegation that defendants failed to return that property or returned it in a damaged condition, Your Honor, and there's no way that plaintiffs can believe that they had personal property and somehow transmitted it through the Internet, Your Honor.

And also that plaintiffs did not allege that there was any exclusive possession of this personal property, which is also fatal to this bailment claim, Your Honor.

So like the other claims that I've discussed, I'd ask that Your Honor find that Count VI also fails as a matter of law, and we ask that Counts I through VII be dismissed, Your Honor.

THE COURT: Okay. Thank you very much.

MS. BURTON-MURRAIN: Thank you.

MR. TACKEFF: Good afternoon, Your Honor. Mike Tackeff on behalf of the plaintiffs in this case.

There's a lot here. There's a lot here in terms of theories, and there's a lot here in terms of case law, but let me see if I can go through quickly some of the things I wrote down in my brother's argument.

Firstly, the federal causes of action, at least some of them, are sufficient. So the diversity issue doesn't matter here.

Second, in terms of lack of personal allegations about the plaintiffs, that's simply not accurate. There are a bunch

of allegations in this complaint about exactly what these plaintiffs experienced, what ads they saw, what conditions they suffered from, and what they -- how they actually interacted with these websites.

For Chloe Noftz, that's at 129 to 140; Tonya Black, 141 to 151; Ken Weinstock, 152 to 163. And, in fact, I believe as to Ms. Noftz and Mr. Weinstock at paragraphs 133 and 156, we allege exactly what kind of ads those folks saw, and the ads certainly need not be commensurate with the diagnosis for us to survive a motion to dismiss.

I think it's sufficient that you see an ad directly after you've used the website. And, furthermore, I understand counsel's argument about some of the "fictitious" hypothetical allegations. I think a lot of the stuff at paragraphs 89 and 96, I think a lot of that material is purely illustrative. I don't think it necessarily pertains to one plaintiff.

As a lawyer who didn't have much experience with these cases, I certainly needed the background to understand what this technology does, what it's actually doing, things like that.

And in terms of -- I'm just running through my list here.

In terms of the duplication between the paragraphs alleging damages, I think that -- and I'll just turn to paragraph 138 as an example. This is the Chloe Noftz, what was

disclosed to Facebook. All of this stuff is stock and trade HIPAA stuff. And let me just quickly read HIPAA. The section I'm thinking of is 42 U.S.C. 1320D-6(a), disclosing individually identifiable health information.

And I think certainly we'd concede that not every single one of these enumerated subparts is necessarily protected, but a bunch of them sure are. Seeking medical treatment, your status as a patient, what you suffer from, the specialties, I mean, that stuff is -- that stuff is pretty classic HIPAA.

Let me see if I can back up here and illustrate with a hypothetical why this is problematic.

I make an appointment with my doctor using KSB's portal. That's in paragraph 144 of the complaint.

I use the portal to view my test results, track my prescription, and find my doctor's phone number. Also in paragraph 144.

KSB, in turn, discloses to Facebook that I did those things. That's in paragraphs 87, 88, 93 and 94.

Making a medical appointment is the most basic way to interact with the medical system, to interact with your online medical record, and that stuff, I think we can all agree, should be private. Patients expect privacy, and providers across the country guarantee it. That's why there are so many of these cases.

Now, certainly over the past week I've read more of these Pixel cases than I ever cared to, but I think what's stuck -- what emerged for me is courts seem to agree generally that the conduct that's being alleged here is problematic. What they disagree on is the legal theory and the remedy to figure that out.

And so that's why I think it's important for us to step back. This is a Rule 12 motion. We don't have to solve the entire case today. This is good old Rule 12, inferences in favor of the plaintiff, accepting all facts as true, all of that good stuff we learned in law school.

We've alleged a lot of alternative theories here, and reviewing the case law, I think you can see why. You almost can't look at different district court opinions without finding different opinions within the same district or within the same state over how these cases should proceed.

But I do think it's telling that almost every opinion I have read in this area of law, something goes forward. And for some judges, that's breach of contract. For other judges, that's the ECPA claims, but -- and I'm going to go through each count in turn as quickly as I can.

And the reality is that different district courts view the remedies here differently, and we certainly understand that, but that's part of the reason that there are so many alternative theories alleged here.

And, in fact, as our notice of supplemental authority indicated, the law in this arena is changing at a breakneck pace, and multiple opinions have come up even since this motion was fully briefed.

And I looked through the *Doe v. Chestnut Systems* case, *Hannant v. Culbertson*, which opposing counsel cited, because my firm was on them. But what's telling to me is that some claims got through in those cases even though they're in the Central District.

But let me just turn briefly to -- the two essential cases for me in this case are *Stein v. Edward Elmhurst Health,* which we cited in our notice of supplemental authority. That's Judge Seeger in this district, 2025 Westlaw 580556. Clearly Judge Seeger likes Batman and analogies. Among other things, there's a whole analogy about The Joker in here, but this case cements for me the ECPA claim survives, the negligence claim survives at minimum.

And then the *Kurowski* case, I mean, right, we have four different decisions from one court on the same case going through all of these allegations. But our complaint is as well pled as it was in *Kurowski IV*, which is the final dispositive ruling there. And in *Kurowski IV*, the federal wiretap claim survives, the Illinois eavesdropping claim survives, and the contract claim is dismissed.

But let me just sort of try to go through as

efficiently as I can the counts that are presented here.

First, negligence, we all remember: duty, breach, causation, damages. For duty, the cases that I just mentioned -- *Aspen Dental*, *Smith v. Loyola*, *Stein* -- all Northern District of Illinois cases, all found a sufficient duty.

I also think that it's somewhat self-evident that if I give you custody of something that's important, like medical records, I think all of us would agree that the recipient has a duty to treat those with respect, and that's what we're alleging didn't happen here.

But going back, duty, breach, causation, damages. The duty arises from Illinois law, common law, HIPAA, a number of things, but each of these cases, *Stein* in particular relied on 815 ILCS 530/45(a). The breach is sharing private material.

Causation is pretty fact specific, but the substance of our allegation is that KSB caused this data to be shared and made intentional choices about sharing it.

Damages, our complaint lays this out pretty carefully. In addition, the economic loss rule doesn't apply because we have non-economic damages, like distress, which is alleged for all three plaintiffs.

For Count II, negligence per se, I believe we said in our brief on page 13 that this is a ride-along claim that rises or falls with some of the -- with the fate of the other counts.

The duty arises from the FTC Act, but I think we said on page 13 that this is a claim that runs alongside.

The contract claims, Counts III and IV, survive. Simple elements again that we all learned in law school: valid and enforceable contract, performance by the plaintiff, breached by the defendant, and injury. We've set forth in our complaint that there was an enforceable contract. That's at paragraphs 268 and 269.

The Central District of Illinois certainly saw these cases a little bit differently in those recent cases I mentioned, but the contract claims survived. So some courts treat this stuff differently.

Then moving through to Count V, I believe we said in our brief, but, if not, I'll say it here. Count for unjust enrichment in Illinois to the best of my knowledge is also a complaint that rises or falls with the fate of the other counts. It doesn't exist independently.

So that's -- and unfortunately some cases in this court some judges will say, okay, it's not an independent claim and then dismiss it; and other judges will say the same thing and keep it. So it's really up to the Court how to handle that one, but -- as it is with all of these.

Count VI, bailments, the *Krupa* case out of Indiana has discussed why that's a viable theory. I thought that was very creative. Bailment is an old-school common law count, and it

can involve intangible property under Illinois law.

And taking a step back, if one of these plaintiffs has a broken toe and is seeking treatment at KSB specifically, he is giving possession of the information about the broken toe to KSB, that's -- that's exclusive.

Count VII, Illinois eavesdropping, not a particularly well-written statute. It's hard for me to believe that the 2014 amendment was intended only to address oral communications, but -- and some of the cases in this district, *Loyola* and *Kurowski IV,* let this claim through.

Count VIII, the ECPA, this one should survive. And there are four -- I mean *Kurowski IV, Aspen Dental*, *Loyola*, *Stein*, very on point cases from within this court, and as I read through all of the tangling here about the crime-tort exception, I think that *Stein* and *Kurowski IV* got it right in terms of explaining why the exception to the exception applies and in -- this is in *Kurowski IV,* which is 2024 Westlaw 3455020, at *5, talking about "many crimes and torts are motivated by a desire to make money."

And there's certainly no intent requirement in Section 2511(2)(d), and the *Stein* case, 2025 Westlaw 580556, lays out precisely why it wouldn't make sense to have an intent requirement there.

And certainly *Stein* explains that there are cases that have held that the crime-tort exception does not apply when the

underlying motivation is financial. Most of them come from one district, the Northern District of California. This district historically has seen things differently, and I think the logic in *Stein* is probably the correct one.

Moving forward, Counts IV and X -- I'm sorry -- I misread that. Counts IX and X, boy, the language in 18 U.S.C. 2510(15) seems crystal clear to me that any service which provides users thereof the ability to send or receive wire or electronic communications. That's -- I mean, communicating with your doctor through an electronic communication, that seems clear to me. Obviously, many district courts have seen it differently. We understand that.

And then finally Count XI, the Computer Fraud and Abuse Act, I read *Van Buren* as an overzealous AUSA case. I don't think it applies here, and there are numerous cases that have said that it doesn't, but certainly I understand the invocation.

I also want to remark that there are certainly a lot of cases here. There are certainly -- the Court is not writing on a blank slate in these cases, but let me just give one example from defendant's brief.

On page 15, and this is the first brief, so this is Docket entry 12-1. The defendants -- KSB writes: This Court, so Northern District of Illinois, has also held that where plaintiffs allege a HIPAA crime or tort based on the use of

Meta Pixels "that collected patients' browsing data during visits to hospital websites are far too vague to allow an inference to be drawn that defendants were actually disclosing data within HIPAA's statutory definition of individually identifiable health information." Cited for that proposition is *In re TikTok, Inc.*, 2024 Westlaw 4367849 with the famous cleaned-up signal.

Now, when we look at the *TikTok* case, it doesn't really say that. *TikTok* was not a Pixel case. The court in *TikTok* was actually quoting *Kurowski II*, which is not the most up-to-date case on this issue.

So -- and then when we actually break down what KSB is actually saying here, we do allege that KSB disclosed PHI. That's in paragraphs 87, 114, 115, and 138. We've also alleged that KSB disclosed actual medical records, financial information, and diagnoses. That's in paragraphs 87, 115 and 120.

Unless the Court has any questions, I think I'm done.

THE COURT: In terms of the case law, are there particular cases -- I mean, obviously -- I mean, both parties have cited the Central District case. Then you mentioned *Stein* and *Kurowski IV* and then *TikTok*.

Are there particular cases that you think it is worth focusing on?

MR. TACKEFF: Yes.

THE COURT: Okay.

MR. TACKEFF: Yes. So -- and I agree that the case law in this arena is a huge mess, and when we get down to it, you could do a district-by-district law school note about where these cases are going. Let's not do that.

So the first one is *Stein v. Edward Elmhurst Health*, 2025 Westlaw 580556. This came out of this court, Judge Seeger, just a few months after the briefing on this motion closed. Not only was this opinion a pleasure to read, but this is exactly this case. This is exactly this information. It's also, frankly, if I lose here, I'll be lifting all of the material in my appellate brief from how he explains at *7-8 how the -- or, I'm sorry, it's *5-6, thank you, at how the HIPAA crime-tort exception works.

*Kurowski IV*, the parties extensively cited that. That's 2024 Westlaw 3455020. That one I think is important because it traces the development of that complaint over the four decisions from that court, and our complaint is as detailed as the one that essentially survived *Kurowski IV*. I'm sure I'm not saying that name correctly.

Then finally the other ones are *Aspen Dental* and *Loyola*. Those are cited in our brief. I don't have the cites on me at this moment, but I can grab them if the Court wants them.

THE COURT: That's okay. I can look that up from your

brief. Thank you.

MR. TACKEFF: Those are the cases I would focus on.

THE COURT: Do any of the -- does any of those cases involve literally all of the same causes of action --

MR. TACKEFF: Yes.

THE COURT: -- or counts?

MR. TACKEFF: Yes.

THE COURT: Okay.

MR. TACKEFF: So -- let's see how good my notes are.

So in *Stein*, we've got the ECPA, we've got Illinois eavesdropping, and we've got negligence.

Then in *Kurowski IV*, there were some contract claims, also an ECPA claim, also an Illinois eavesdropping claim.

Just a moment, Your Honor, let me grab these.

THE COURT: Sure.

MR. TACKEFF: Okay. *Aspen Dental* is 2024 Westlaw 4119153. That case also included an ECPA claim, Illinois eavesdropping claim, negligence, and unjust enrichment.

*Smith v. Loyola* -- I apologize for the alphabet soup -- is 2024 Westlaw 3338941, again, ECPA, negligence, Illinois eavesdropping. So these are all pretty close.

And I'm sure that these cases get pled in the alternative so assiduously because it's just too difficult to predict what each court is going to go for. And if you look for -- if you look at *Hannant v. Culbertson* and *Doe I v.*

*Chestnut*, I think those cases are wrong. Those are from the Central District.

Those cases are wrong on the ECPA claim, but in *Hannant*, the court felt that negligence was enough, and in *Doe I,* the court felt the contract claims were enough. So it's sort of however the court wants to slice the ham.

THE COURT: Okay, but -- I'm sorry, I -- I think I can see across those different cases that there's the ECPA, there's Illinois eavesdropping, there's contract claims, there's negligence, there's unjust enrichment.

Does any of them -- are there any other federal claims that are not addressed in those cases that are raised here? Is there a Computer Fraud Act claim?

MR. TACKEFF: In some of them, yes.

THE COURT: Okay.

MR. TACKEFF: I don't know that there's -- just a moment.

THE COURT: Okay.

MR. TACKEFF: This is a giant Venn diagram that --

THE COURT: Okay.

MR. TACKEFF: -- to some degree is -- and, of course, right, some of them which are good for us on some claims are bad on others --

THE COURT: Okay.

MR. TACKEFF: -- which is just -- that's just life in

this particular practice area.

THE COURT: And also, I'm sorry, did any of those ones address the bailment, or is bailment -- that's the Indiana --

MR. TACKEFF: That's the Indiana one --

THE COURT: Okay.

MR. TACKEFF: -- which -- let me grab the cite for that.

Here we are. The bailment one is *Krupa v. TIC International Corp.*, that's 2023 Westlaw 143140.

THE COURT: Okay.

MR. TACKEFF: That's from the Southern District of Indiana.

THE COURT: Okay.

Going back quickly to the jurisdiction, so you're saying there is -- you're saying the federal claims survive, so the minimal diversity is -- or diversity jurisdiction is not a problem because you're relying on 1331.

MR. TACKEFF: Yes, so --

THE COURT: Okay.

MR. TACKEFF: -- and let me put an even finer point on that.

The ECPA claim survives.

THE COURT: Okay.

MR. TACKEFF: That's a federal question, and so that's -- we do allege in our complaint that there are other

class members from other -- from other judicial districts. I don't think we have the name of an individual who's diverse.

I think I heard counsel say that the 11th Circuit says you need to cite a specific person. We're in the 7th, so -- but the really relevant point is that that question is not necessary to answer because the ECPA claim survives, period. So that question is ancillary.

THE COURT: Okay. There are some cases in this district that discuss the distinction between claims and counts.

So there is a case, and this is by Judge Tharp, that addresses -- it says before addressing -- let me give you the citation. It's *Hirst*, H-I-R-S-T, *v. Skywest*, 2022 WL 3999701, Northern District of Illinois, August 31, 2022. I'll just say the Westlaw citation once more. 2022 WL 3999701.

And so this -- and I believe there are potentially other Northern District cases on this point, but I'm not totally sure on that. But at least this case is saying -- I'm just going to quote from it -- "Before addressing the claims of the California-based plaintiffs, it is helpful to recall the distinction between claims and counts."

And I'm just going to skip -- there's a lot of quotes and internal alterations, but just for clarity, I'm going to just read without trying to recount all of that.

So it's saying, "A claim is the aggregate of operative

facts which give rise to a right enforceable in the courts." And I'm also going to be skipping citations here because it just interrupts the flow. So there's some citations.

Then it says, "A count is the articulation of a legal theory that may provide support for the plaintiff's claim. Multiple legal theories may support a single claim, but one claim supported by multiple theories does not somehow become multiple claims."

Again skipping citation.

"Rule 12(b)(6) gives district courts the authority to dismiss only claims for relief, not legal theories offered in support of claims," and then it cites a Seventh Circuit case called *BBL v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015), and it quotes that case saying, "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims."

Then picking back up with *Hirst*, it says, "In short, the court may not dismiss challenged legal theories, only challenged claims."

So I guess I was -- I thought of that because you mentioned this point about different courts are coming to different conclusions about whether different counts can proceed, and -- but I'm not exactly sure how to think about that, because I -- or about, you know, this point from the *Hirst* case because if that's right, then perhaps you might say,

well, all of this ultimately is discussing basically a common set of facts, and they're different legal theories arising from essentially the same facts. And so what's the basis for dismissing a particular legal theory at the motion-to-dismiss stage if that's really what all these different counts are.

At the same time, you just mentioned, and everybody is talking about a lot of different district court cases that are doing that. So, yeah, not sure exactly what to make of that, but --

MR. TACKEFF: I would just say, Your Honor, that this is why we have Rule 8, right? Inartful pleading is not exactly a crime, right, but I would structure it as our approach here was to plead different theories, and if I wanted to chop these up into claims instead of counts, right, then I think I would say negligence, contract theories, bailment theories, and then we get into sort of the more statutory territory of Illinois eavesdropping, the ECPA, and the CFAA -- alphabet soup again. But if that's sort of the way the Court wants to approach this in terms of the claims, not the counts, I -- I understand that.

And it may be that certain parts of the ECPA claim can proceed, whereas other parts of an ECPA claim, like the service provider stuff, may not be able to proceed. But if I had to chop this up, I would say negligence, contract claims, bailment, Illinois -- then we get into the Illinois eavesdropping, ECPA and CFAA.

I'm not sure that I'm answering your question.

THE COURT: No, I think that's fair. I --

MR. TACKEFF: The *Stein* case has some commentary at the beginning sort of suggesting that perhaps the complaint in *Stein* was too long and that perhaps it gave too much background, which -- and I'll even quote, "Here plaintiffs filed a complaint that weighs in at 106 pages. That's not exactly short. It is more than enough to create multiple squadrons of paper airplanes."

That happens to be true of our complaint, too, which we certainly acknowledge, but I personally needed the background to understand what was actually happening here, but we acknowledge it's a lengthy complaint.

There's certainly enough in here to give the defendant notice of what's happening and notice of the theories we're proceeding under, and that's what's required.

THE COURT: Okay.

All right. I think at this point, I don't know that I have any more questions, but thank you very much.

MR. TACKEFF: Thank you.

MR. KARNIK: Your Honor, if I may have just a minute or two.

THE COURT: Yes.

MR. KARNIK: And then my co-counsel as well after --

THE COURT: Sure.

MR. KARNIK: Sure. Thank you, Your Honor.

Quickly addressing the minimal diversity point, Your Honor, and forgive me if I misquote or misstate my opposing counsel, but I believe that plaintiffs are saying that the minimal diversity issue is -- is -- is not much of a dispute right now or is not really pertinent to the case.

I just have to disagree with that because minimal -- you know, under 28 U.S.C. 1332(d), the plaintiff -- one of the putative class plaintiffs have to be of a different citizenship than the defendant.

And then in the Seventh Circuit, the cases that I read in my initial case, that -- that requirement is -- is, you know, is -- it's a real requirement for -- in order to have -- in order to pursue class action claims.

And so to the extent the plaintiffs want to, you know, minimize the issue, they are correct when they're saying that if the Wiretap Act or if one of the federal causes of action survive, yes, this case continues under 28 U.S.C. 1331, but there is no scenario under which the plaintiffs can pursue a class action in this court, in this United States District Court.

That is because they don't allege a minimal diversity, and while plaintiffs' counsel points out that they said that the complaint states that there could be one potential member of a different state, that is not the law in the Seventh

Circuit.

The *Dancel v. Groupon* and *Toulon* cases state that you cannot simply, you know, fail to identify a specific class member who is a citizen of a state other than Illinois. And so if the plaintiffs no longer want to pursue a class action and then the federal court claim -- one of the federal claims survive, then, yes, we are here. But there is no scenario in which a class action can continue in this court as the plaintiff -- as the complaint is currently alleged.

My remaining point, Your Honor, is that there are, you know, conflicting cases, and plaintiffs have correctly stated, you know, *Kurowski IV* and some of the recent -- some of the more recent decisions.

Importantly, in *Kurowski IV*, they had said that, you know, that the plaintiffs had, you know, corrected some of the prior errors of the earlier complaints, which we do rely on *Kurowski I and II*. Those are -- you know, those are published opinions, and they're still good opinions for the complaint as they existed then, and we believe that plaintiffs' complaint is in the, you know, is more along the lines of those earlier complaints.

I think in *Kurowski IV*, they even mentioned that, you know, clicks and references to cookies and aspects of where -- you know, how a navigation went are inferior to invoke the crime-tort exception.

So, Your Honor, I recognize that *Stein* and *Kurowski IV* have -- you know, in those situations, the plaintiffs have alleged those more specific medical issues, but they have not done so here.

Even referring to paragraph 156 and some of the other allegations, Your Honor, they still lack any type of specific detail. It is more of a conclusory checklist assertion, which makes -- makes it fare no better than the hypothetical allegations, Your Honor.

I realize I could go on, but let me just allow my co-counsel to have us wrap it up.

Thank you.

THE COURT: Okay.

MS. BURTON-MURRAIN: Thank you, Your Honor, for allowing us to go back and forth, and I really will be brief because there's a lot of case law, you've heard a lot, and I don't want to throw too much more at you, Your Honor. But negligence doesn't survive, Your Honor, and I specifically want to address the common law negligence.

In the recent decision that both sides have now cited, *Chestnut Health System*, which is in the Central District, the court states, "The Illinois Supreme Court has not recognized the duty to safeguard personal information, and the appellate courts have reached conflicting conclusions." Correct, we recognize that there are conflicting conclusions.

"However," the court goes further to say, "that leaves the court bound to follow controlling decisions by the Seventh Circuit and the Illinois Supreme Court, neither of which have yet to recognize a common law duty to safeguard personal information.

"To the contrary, in 2018 the Seventh Circuit reaffirmed that Illinois has not recognized an independent common law duty to safeguard personal information, also found no reason why the Illinois Supreme Court would likely disagree with the *Cooney* analysis on this issue of duty under the common law." And this is *Community Bank of Trenton v. Schnuck*, 887 F.3d 803 at 817. This is Seventh Circuit 2018, and this was cited in the June 6th, 2025 ruling over in the Central District, Your Honor.

Negligence doesn't survive here, not the common law negligence, Your Honor, and especially not negligence per se because though the plaintiff cites the FTC Act as a basis for negligence per se, HIPAA, MPRA, PIPA, none of those has the statutory intent for it to be strict liability, Your Honor.

So it's our position that the negligence count should be dismissed, Your Honor. And then I'm just going to quickly switch to bailment.

Your Honor, I do understand that there's conflicting information here. Bailment is not a viable claim, Your Honor. There's no personal property. There's no -- and I understand

that hypothetical that plaintiff gave, Your Honor, but considering the facts of these cases -- of this case, Your Honor, bailment does not survive.

There's no personal property. There's no exchange of that personal property. The property wasn't damaged. They're not alleging that property was damaged or not returned, and they're not alleging that KSB was in exclusive possession of this alleged personal property. And I do give it to them, you know, this is innovative, but considering the law as it is now, Your Honor, bailment does not survive.

And just quickly, I want to touch on the breach claim, the breach counts. One thing, in addition to what I previously stated, Your Honor, regarding a breach has to be an actual contract, but plaintiff, they state in a conclusionary form that they performed under the contract. That's it. That's their basis that, you know, that they did their part. They performed.

Now, and I do understand we have to accept things at this stage, and we -- you know, favor is toward the plaintiff, but the conclusionary language of we performed, Your Honor, that's not enough. In addition to all of the other things that I previously stated, the breach claims also cannot survive, Your Honor. And I won't go through the other claims that we believe tag onto the breach claim, which is like unjust enrichment.

But lastly regarding Illinois eavesdropping, plaintiffs in fact do combine the language of various sections of the Eavesdropping Act, Your Honor.

The 2014 amendment specifically noted, it added language regarding communications that's at issue here, electronic communication. That was for a reason, Your Honor.

That's because the other section that plaintiffs cite does not apply. There's no oral communication here, Your Honor, and private -- private communication is not the same as the electronic communication that the 2014 amendment made clear, Your Honor.

So we ask that you dismiss all the counts that we've argued today, Your Honor.

Thank you.

MR. TACKEFF: I just need to put on the record we do want to pursue a class action, and the one diverse citizen allegation is in paragraph 36. And that's it.

Thank you.

THE COURT: Let me just make sure I understand this particular argument.

So this is -- yeah, in paragraph 36, it says, "This court has subject matter jurisdiction over the subject matter over this action under 28 U.S.C. Section 1331 because it arises under the laws of the United States," so just pausing there, that's just -- you know, that's pleading federal question

jurisdiction.

And then just continuing with paragraph 36, it says, "And under 28 U.S.C. Section 1332(d)" -- that's CAFA -- continuing with paragraph 36, "because this is a class action wherein the amount in controversy exceeds the sum or value of $5 million exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from defendant." So it's pleading not complete diversity but the minimal diversity, which is the CAFA rule.

So -- and, I'm sorry, the defense's argument is under the 11th Circuit case, the complaint needs to plead the actual citizenship of the citizen of a state that is -- the class member in question. So the complaint needs to plead minimal diversity by specifically identifying a member of the class who is a citizen of a state different from defendant. Is that the argument from the defense?

MR. KARNIK: Yes, Your Honor, and I'm sorry if I keep on saying 11th. With respect to minimal diversity, I do not mean to say 11th if I've been saying that.

What the -- what the Seventh Circuit says in *Toulon v. Continental Casualty Co.*, 877 F.3d 725 (7th Cir. 2017), the Seventh Circuit criticized a plaintiff who had originally brought a suit in federal court for failing to "identify a specific class member who is a citizen of a state other than

Illinois," and that is the quote of *Toulon*, which I just gave, was by the Seventh Circuit two years later in *Dancel v. Groupon*, 940 F.3d, 381, 385 (7th Cir. 2019). So I apologize if I've been saying 11th.

You know, under -- I mean, I believe that that means that a plaintiff or a putative class action complaint must specifically identify a specific class member of a different state. There may be other circuits which say that the overall facts can suggest that, you know, the class would capture plaintiffs from other states, perhaps in a consumer class action against Coca-Cola or something that's more of a national scope.

But here where the plaintiffs are alleging specifically a class -- a nationwide class of only patients of KSB Hospital and a subclass, an Illinois subclass of only patients, you know, that everything in the complaint suggests that even the putative class would only be, you know, Illinois citizens or residents.

But specifically, Your Honor, under Seventh Circuit law, plaintiffs failed to identify a class member of a different state than Illinois. And so that's why we argue that there's no even minimal CAFA jurisdiction.

Thank you.

THE COURT: Okay. Thanks.

MR. TACKEFF: Very, very briefly.

The first thing I'd say is that we have to accept all facts pled in the complaint as true.

Secondly, I'm not familiar with those two cases, but this is a big hospital system, and so it's hard for me to imagine that there isn't a -- at least one member of the class who is a citizen of a state different from defendant.

Also, I'll say that in terms of remedies, if the Court were to dismiss for this reason, that's the kind of thing that we would cure with an amendment. So the substantive issues that we've been talking about here today I think would still be in play.

Thank you.

THE COURT: Let me just back up for a second.

So if that -- if that allegation, meaning the allegation in paragraph 36 -- well, okay, paragraph 36 has two bases for jurisdiction that it's alleging. One is the federal question jurisdiction, and the other is CAFA.

So say that those cases under the Seventh Circuit cases that the defense has cited, *Toulon* and the *Dancel v. Groupon* case, if the CAFA allegation is not adequate to plead minimal diversity because it doesn't identify the member of the class that is a citizen of a state different from defendant, then what are the implications of that?

I mean, I'm not saying that that's the case, but I'm just trying to think through, okay, say that that argument by

the defense is correct, that the CAFA allegation is not sufficient to plead CAFA jurisdiction. Then what?

MR. TACKEFF: Do you want to go first?

MR. KARNIK: Sure, were you --

THE COURT: Oh, yes, either -- I would like to ask both parties.

MR. KARNIK: Sure, Your Honor.

If -- if and as defendant believes that this allegation in 36 is insufficient under the Seventh Circuit cases we stated, that's our position, we don't -- we do not deny that the plaintiffs have also pled 28 U.S.C. 1331.

And so if one of the federal causes of action survives, what we have is just, whether it be Noftz, Black and Weinstock collectively or individually, they just have individual federal causes of action against KSB Hospital.

THE COURT: I see, okay.

MR. KARNIK: So in other words, you know, paragraph 36 is insufficient, and there's no scenario as a result in which the plaintiffs, these three plaintiffs alone, can pursue a class action in this court.

THE COURT: I see. So -- but any potential deficiency in the CAFA pleading or the jurisdictional CAFA allegation, it doesn't mean there's no more subject matter jurisdiction entirely. It just means there's no jurisdiction over a putative class action, so individual claims by these named

plaintiffs could proceed potentially? I mean, obviously subject to all the other arguments you're raising that are not about jurisdiction, but --

MR. KARNIK: Right, Your Honor.

THE COURT: Okay.

MR. KARNIK: If the Court, you know, we obviously are arguing for dismissal on the substance of the lack of allegations for every claim, including the federal causes of action, but the only properly pled jurisdictional statement here, Your Honor, when reading the entire complaint is 28 U.S.C. 1331 and the federal causes of action.

Conceivably -- you know, in other words, anything that makes this a class action, Your Honor, is insufficiently pled because there is no other non-Illinois plaintiff specifically named.

So -- so there could be the three individual plaintiffs pursuing one of the federal causes of actions by themselves, by them three, and then there could be technically 28 U.S.C. 1367 supplemental if the Court finds that one of those state law claims have been adequately pled.

Of course, we're arguing for dismissal on the merits and then certainly any dismissal of any class action claim because there's no CAFA jurisdiction. There's a reason why these three plaintiffs, Your Honor, first filed suit in state court. Then they filed an amended complaint, and then they

dismissed that lawsuit voluntarily and refiled here.

But if they want to pursue a class action, they were right the first time in state court. These three Illinois citizens cannot, under 1332(d) and Seventh Circuit precedence, pursue a federal class action in this United States Court.

MR. TACKEFF: The only thing I would add is that I think this allegation is sufficient, but let me just also read from *Dancel v. Groupon*, and this is right at 940 F.3d 381. 383 is the pincite.

"We accepted Christine Dancel's petition under FRCP 23(f) so that we could review the district court's denial of class cert."

So to me this is all cart-before-the-horse issues that we can resolve at the class cert. stage, not here.

Thank you.

THE COURT: I mean, okay, I'm looking at also the first paragraph of *Dancel*, so 940 F.3d 381 (7th Cir. 2019), and it starts that way. It says, "We accepted Christine Dancel's petition under Federal Rule of Civil Procedure 23(f) so that we could review the district court's denial of class certification. Dancel, however, has proceeded as though we gave her a free ticket to re-do her opposition to the removal of her suit from state court. Although we refuse to entertain the bulk of her arguments, she has drawn our attention to a critical hole in the notice of removal. It does not allege the

citizenship of even one diverse member of the putative class. We, therefore, order a limited remand so that the district court can patch this hole, securing its jurisdiction over the case."

So, I mean, that sounds like it's talking about you do need to allege the citizenship of at least one diverse member of the putative class, and otherwise there is a jurisdictional issue.

But that's just the first paragraph, so I'm not -- have to keep reading through this to see what that ultimately says.

MR. TACKEFF: Although I'm certainly loath to suggest that we continue spending money to brief this issue, I mean, would the Court entertain, I don't know, five-page briefs on this issue within seven days? I mean, does that -- is that helpful or not?

That's just a suggestion.

THE COURT: What would be the defense's position on that?

MR. KARNIK: Your Honor, before I give a position, let me -- going to the end of the opinion in *Dancel*: We order a limited remand for the district court to permit discovery to whatever extent the court deems necessary for *Groupon* to allege that at least one member of the putative class -- this remand is limited solely to the question of subject matter

jurisdiction and does not independently -- okay.

We're not going to oppose that, Your Honor. We think that it speaks for itself, but we can turn in a brief within one week about jurisdiction and minimal diversity --

THE COURT: Okay.

MR. KARNIK: -- if the Court believes it's necessary.

THE COURT: I'm just trying to -- I may not be able to do this sitting here right now, but I'm just trying to scan through the *Dancel* case to see if I can --

(Pause.)

THE COURT: Okay. So I think there are a couple options. One is if you would like to file supplemental briefs on a, you know, pretty short time frame, we can do that.

The other option is if you don't want to brief it, I think if I just spend some more time with these cases, I could probably feel comfortable, you know, ruling on the basis of the existing briefs. But if you would prefer to file briefs, that's fine. We could pick a date relatively soon and probably just do them simultaneously.

MR. TACKEFF: Well, Your Honor, I mean, I had not read this case prior to today, but "we order a limited remand for the district court to permit jurisdictional discovery." That's in the final paragraph.

So if -- if the defendants -- if KSB wants to give us a list of its patients on the date of the removal or the date

we filed the case, I doubt they want to do that, but that's -- that would be the way to do this because that is what this case says. It said -- and that's information that is uniquely in the custody of defendant.

So I have a feeling that KSB would prefer not to expend funds to assemble a patient list. I would bet a lot of money that in a big hospital system, there will be one -- at least one member of the class who's a citizen of a state different from defendant.

So we can certainly go down that road, but, I mean, or we can do the briefs thing, but that's -- I mean, in my also very limited review of this case, that is what this is doing is if the district court, after a reasonable time, is not convinced that Groupon can carry its burden, then it can enter a ruling that it doesn't have subject matter jurisdiction.

So that -- if jurisdictional discovery is something that KSB wants to give us, then great.

MR. KARNIK: Your Honor, we don't -- we don't believe that the defendant has to help the plaintiff cure their deficiencies in their complaint.

You know, plaintiffs are the ones who wanted to file this lawsuit. There was a pending motion to dismiss in state court. That had been argued -- there were two motions to dismiss. They amended the complaint. They've already, you know, multiplied the proceedings plenty, you know, causing a

lot of legal fees to our client.

You know, to the extent that the plaintiffs are contending that we're a big hospital system, we did file a notice stating that OSF Healthcare is now the owner of KSB Hospital. The hospital has been renamed.

But as the complaint existed when filed, we're dealing with a small rural hospital in Dixon, Illinois. I think there are other satellites that were part of the then Katherine Shaw Bethea system. But it was by no means, like, a major system, my point being that we don't -- we don't believe that we need to, you know, entertain any jurisdictional discovery.

We also believe, Your Honor, as you stated, that the Court could decide without further briefing, but given that we hadn't, you know, stated that *Dancel v. Groupon* case in our briefing and specifically focused on the supplemental jurisdiction aspect, we're happy to submit briefing in a week limited to five pages. That's fair.

MR. TACKEFF: I mean, I think it's up to the Court. I mean, we're certainly happy to submit a short brief. That's no problem, and might give us all an opportunity to further develop this issue.

But I guarantee that, I mean, in -- *Dancel v. Groupon* literally says that jurisdictional discovery is appropriate, so if that's the -- that's probably what I'll ask for, but --

MR. KARNIK: Defendant opposes jurisdictional

discovery, Your Honor. If plaintiff wants to make that as part of their briefing, that's fine; but when we brief, we're going to mention these cases and then look for other support that minimal diversity is not met, Your Honor, for a class action.

Thank you.

THE COURT: Okay. Let me just clarify.

So I think I can do this by just reading the case or these couple Seventh Circuit cases, so I don't think I necessarily need the briefs, but I also want to give the parties an opportunity if you -- if you would prefer to submit briefs to do so.

So I guess my own inclination, unless a party would request a brief, would be for me to just read the cases and decide. But if you think you would like to brief it, let me know, and then we'll do briefs.

(Counsel conferring.)

MR. KARNIK: Your Honor, if -- I mean, we do leave it to you. We will recite the cases that you've seen and had an opportunity to -- to -- to review.

You know, we don't believe that briefing is necessary. We will -- we'll agree to it just out of the fact that it was not in our initial brief, so we'll -- that's -- we believe that the law is on our side either way, so we're happy to -- we'll agree to a brief, Your Honor, unless you -- unless, you know, plaintiffs have changed in the last minute, but I don't think

they have.

MR. TACKEFF: If the Court doesn't need a brief, then I'm inclined not to file a brief.

MR. KARNIK: All right.

MR. TACKEFF: But it's up to you.

THE COURT: Okay.

MR. KARNIK: Then that's fine, Your Honor. We don't need briefing.

THE COURT: Okay. Then I think it's okay to proceed without briefs.

MR. KARNIK: Thank you.

MR. TACKEFF: Thank you.

THE COURT: All right. But I think, you know, given this especially and also just wanting to go back and take a look at the cases that you were mentioning today during the argument, it makes sense just to pause at this point and take this under advisement, and I will let you know either -- either I'll send a ruling just on the docket, or I will schedule a ruling from the bench.

I think if I do a ruling from the bench, it wouldn't -- or at this point, I don't anticipate needing further argument. It would just be providing the ruling. So we could hold that by telephone if that's easier for you not to have to come over here.

MR. TACKEFF: That would be appreciated, but we'll

come if you want us to come.

MR. KARNIK: Telephone is fine, Your Honor.

THE COURT: Okay.

MS. BURTON-MURRAIN: Yes, Your Honor.

THE COURT: All right. Great.

Well, thank you all very much. I really appreciate it. It was very helpful.

MR. KARNIK: Thank you, Your Honor.

THE COURT: Thank you.

MS. BURTON-MURRAIN: Thank you, Your Honor.

(Concluded at 3:14 p.m.)

\*    \*    \*    \*    \*

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell*          *September 24, 2025*
Kathleen M. Fennell                Date
Official Court Reporter