**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHLOE NOFTZ, TONYA BLACK and KENNETH WEINSTOCK, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**KSB HOSPITAL FOUNDATION d/b/a KSB HOSPITAL F/K/A KATHERINE SHAW BETHEA HOSPITAL,**<br><br>**Defendant.** | **Case No. 1:24-cv-08100** |

**DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES**

Defendant Katherine Shaw Bethea Hospital ("Defendant" or "KSB")[1] hereby files its Answer and Affirmative Defenses to the Plaintiffs' Class Action Complaint and Jury Demand, Doc. 1 ("Compl."), respectfully showing as follows:

**INITIAL STATEMENT**

Defendant submits this Answer and Affirmative Defenses solely as to the claims which remain following the Court's August 12, 2026 ruling on Defendant's Motion to Dismiss, which was granted in part and denied in part. Any allegation contained in the Complaint that pertains to causes of action which were dismissed by the Court is answered only to the extent required by the Federal Rules of Civil Procedure. Subject to and without waiving the effect of the Court's August 12, 2026 ruling on transcript, Defendant denies all allegations of wrongdoing and denies that

[1] Defendant has informed Plaintiffs that KSB Hospital Foundation is a distinct entity from Katherine Shaw Bethea Hospital, which was the not-for-profit hospital located in Dixon, Illinois. Doc. 12. Following a merger and acquisition, the new proper name for Defendant should be OSF Healthcare System d/b/a OSF Saint Katharine Medical Center. Doc. 20. For the convenience to the parties, Defendant will continue to refer to itself as KSB Hospital as identified in the Complaint. Defendant reserves all rights, privileges, and defenses with respect to the incorrect party name.

Plaintiff is entitled to any relief whatsoever on the causes of action which remain. Defendant further denies each and every allegation not expressly admitted herein.

Pursuant to LR 10.1, Defendant restates below each numbered paragraph of the Complaint, followed by Defendant's response. The allegations from the Complaint are singled-spaced and italicized to distinguish from Defendant's responses to each Paragraph. Defendant restates the allegations solely to comply with LR 10.1: doing so is not an admission of any allegation. Except as expressly admitted below, Defendant denies each and every allegation of the Amended Complaint, including any allegation contained in headings, subheadings, footnotes, images, exhibits, or the unnumbered introductory paragraph and Prayer for Relief.

## ANSWER

## INTRODUCTION

1. *Plaintiffs bring this class action to address Defendant's improper practice of disclosing the confidential Personally Identifying Information ("PII")*[2] *and/or Protected Health Information ("PHI")*[3] *(collectively referred to as "Private Information") of Plaintiffs and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook"*

---

[2] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[3] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). KSB is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

*or "Meta"),*[4] *and potentially others ("the Disclosure") via tracking technologies used on its website.*

**Response:** Defendant admits that Plaintiffs bring this matter as a class action and deny all remaining allegations in Paragraph 1.

2. *The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."*[5] *OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."*[6] *OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."*[7]

**Response:** Defendant denies the allegations in Paragraph 2. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

3. *Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not*

---

[4] Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. in October 2021. Plaintiffs' reference to both "Facebook" and "Meta" throughout this complaint refer to the same company.

[5] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[6] *Id.*

[7] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf ), **attached as Exhibit A.**

*disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.*

**Response:** Defendant denies the allegations in Paragraph 3.

4. *Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization.*

**Response:** Defendant denies the allegations in Paragraph 4. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

5. *In December 2022, HHS released a bulletin on its website regarding the use of tracking technologies by entities covered by HIPAA—healthcare entities like PCH—and its business associates (the "December 2022 Bulletin").*[8]

**Response:** Defendant admits that in December 2022 HHS released a bulletin and deny all remaining allegations in Paragraph 5. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

6. *Therein, HHS defined tracking technologies, explaining:*

> *Tracking technologies are used to collect and analyze information about how users interact with regulated entities' websites or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules*

---

[8] *See* archived version of the December 2022 Bulletin at *HHS Office for Civil Rights Issues Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, HHS.gov (Dec. 1, 2022), https://web.archive.org/web/20221201192812/https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

*apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.*[9]

**Response:** Defendant denies the allegations in Paragraph 6. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

7. *In the Bulletin, HHS was clear in unambiguous terms that, "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."*[10,11]

**Response:** Defendant denies the allegations in Paragraph 7. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

8. *On March 18, 2024, HHS updated its December 2022 bulletin, "to increase clarity for regulated entities and the public" and reiterating the above basic privacy obligations.*[12,13]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about whether HHS updated its December 2022 Bulletin on March 18, 2024 as the link cited in Paragraph 8 leads to a web page Bulletin which states that its content was last reviewed on June 26, 2024. To

---

[9] *Id*.

[10] *Id*. (bold emphasis in original)

[11] Citing *to* 45 CFR 164.508(a)(3); s*ee also* 45 CFR 164.501 (definition of "Marketing").

[12] U.S. Dept. of Health and Human Svcs. Office for Civil Rights, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022, updated Mar. 18, 2024), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

[13] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

the extent the remaining allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

9. *KSB is an Illinois "not-for-profit, independent healthcare provider" that operates an acute care hospital, a regional network of primary clinics, and a multi-specialty physician group.*[14] *KSB claims that each year it "reinvests in technology, facilities, and [its] employees in order to continue to meet the changing healthcare needs of [its] hometowns."*[15]

**Response:** Defendant denies the allegations in Paragraph 9 and refers to n.1 regarding Defendant's current organization and business name.

10. *Despite its unique position as a massive and trusted healthcare provider, KSB knowingly configured and implemented into its website, www.ksbhospital.com, (the "Website") code-based tracking devices known as "pixels" (also referred to as "trackers" or "tracking technologies"), which collected and transmitted patients' Private Information to Facebook and other third parties, without patients' knowledge or authorization.*

**Response:** Defendant denies the allegations in Paragraph 10.

11. *Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to search for physicians, locate healthcare facilities, learn about specific health conditions and treatment options, pay bills, sign up for classes and events, and more. Plaintiffs and the Class Members visited Defendant's Online Platforms in relation to their past, present, and future health, healthcare and/or payment for health care.*

**Response:** Defendant denies the allegations in Paragraph 11.

12. *When Plaintiffs and Class Members used Defendant's Website and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded pixels from Facebook, Google Analytics and Google Tag Manager (together, "Google"), Innovid, CallRail, and others into its Website and Online Platforms, surreptitiously forcing Plaintiffs and Class Members to transmit intimate details about their medical treatment to third parties without their consent.*

**Response:** Defendant denies the allegations in Paragraph 12.

13. *A tracker (also referred to as "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.*[16] *When a*

[14] https://www.ksbhospital.com/about
[15] *Id.*
[16] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/

*person visits a website with an tracker, it tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.*[17] *Then, the tracker transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.*[18]

**Response:** Defendant denies the allegations in Paragraph 13.

14. *Among the trackers Defendant embedded into its Website is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a website user's device and the URLs and domains they visit.*[19] *When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.*[20] *Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.*[21]

**Response:** Defendant denies the allegations in Paragraph 14.

15. *Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiffs and Class Members' private health information, alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.*

**Response:** Defendant denies the allegations in Paragraph 15.

16. *Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI") alongside use of the Meta Pixel.*[22]

---

[17] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking

[18] *Id.*

[19] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started

[20] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking

[21] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/

[22] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 16 and therefore denies the allegations.

17. *Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interactions from the website owner's private servers, which transmits the data directly to Facebook, without involvement from the website user's browser.*[23,24]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 17 and therefore denies the allegations.

18. *Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly. For this reason, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."*[25]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 18 and therefore denies the allegations.

19. *Defendant utilized data from these trackers to market its services and bolster its profits. Facebook utilizes data from the Meta Pixel and CAPI to build data profiles for the purpose of creating targeted online advertisements and enhanced marketing services, which it sells for profit.*

**Response:** Defendant denies the allegations in Paragraph 19.

20. *The information that Defendant's Meta Pixel and CAPI sent to Facebook included Private Information that Plaintiffs and Class Members submitted to Defendant's Website contained in the terms they searched, the pages they visited, and the buttons that they clicked.*

**Response:** Defendant denies the allegations in Paragraph 20.

---

[23] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/

[24] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel.… This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api

[25] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965

21. *Such information allows third parties (e.g., Facebook) to learn that a particular individual's health conditions and seeking of medical care. Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers, who then target Plaintiffs and Class Members with online advertisements, based on the information they communicated to Defendant via the Website. Facebook and any third-party purchasers of Plaintiffs' and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.*

**Response:** Defendant denies the allegations in Paragraph 21.

22. *In addition to the Facebook Pixel, and likely CAPI, on information and belief, Defendant installed other tracking technologies, Google Analytics, Google Tag Manager, Innovid, and CallRail, which operate similarly to the Meta Pixel and transmitted Plaintiffs' and Class Members' Private Information to unauthorized third parties.*

**Response:** Defendant denies the allegations in Paragraph 22.

23. *Healthcare patients simply do not anticipate that their trusted healthcare provider will send their private health information to a hidden third party—let alone Facebook, a company with a sordid history of violating consumer privacy in pursuit of ever-increasing advertising revenue.*

**Response:** Defendant denies the allegations in Paragraph 23.

24. *Neither Plaintiffs nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook or any other third parties uninvolved in their treatment.*

**Response:** Defendant denies the allegations in Paragraph 24.

25. *Despite willfully and intentionally incorporating the Meta Pixel, potentially CAPI, and other third-party trackers into its Website and servers, KSB has never disclosed to Plaintiffs or Class Members that it shared their Information with Facebook, Google, Innovid, CallRail, and possibly others.*

**Response:** Defendant denies the allegations in Paragraph 25.

26. *Defendant further made express and implied promises to protect Plaintiffs' and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.*

**Response:** Defendant denies the allegations in Paragraph 26.

27. *Defendant owed common law, statutory, and regulatory duties to keep Plaintiffs' and Class Members' communications and Private Information safe, secure, and confidential.*

**Response:** Defendant denies the allegations in Paragraph 27.

28. *Upon information and belief, KSB utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.*

**Response:** Defendant denies the allegations in Paragraph 28.

29. *Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.*

**Response:** Defendant denies the allegations in Paragraph 29.

30. *Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by, inter alia: (i) failing to adequately review its marketing programs and web-based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share patient information; (iii) aiding, agreeing, and conspiring with third parties to intercept communications sent and received by Plaintiffs and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Facebook and others; (v) failing to protect Private Information and take steps to block the transmission of Plaintiffs' and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.*

**Response:** Defendant denies the allegations in Paragraph 30.

31. *Plaintiffs seek to remedy these harms and bring causes of action for (I) Negligence; (II) Negligence Per Se; (III) Breach of Express Contract; (IV) Breach of Implied Contract; (V) Unjust Enrichment; (VI) Bailment; (VII) Violation of the Illinois Eavesdropping Statute, 720 Ill. Comp. Stat. 5/14, et seq.; (VIII) Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), et seq.; (IX) Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)(a) ("Unauthorized Divulgence By Electronic Communications Service"); (X) Violation of Title II of the Electronic Communications Privacy Act, 18 U.S.C. § 2702, et seq.; and (XI) Violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq.*

**Response:** Defendant admits that Plaintiffs bring causes of action for the claims stated in Paragraph 31 but denies that Plaintiffs are entitled to relief against Defendant for any of these listed dismissed or still operative claims.

## PARTIES

32. *Plaintiff, Chloe Noftz, is a natural person and a resident and citizen of Illinois, where she intends to remain, with a principal residence in Dixon, Lee County. She is a patient of KSB and a victim of Defendant's unauthorized Disclosure of Private Information.*

**Response:** Defendant admits that Plaintiff Chloe Noftz is a citizen of Illinois and, upon information and belief, admits that she was a patient of KSB. Defendant denies all remaining allegations in Paragraph 32.

33. *Plaintiff, Tonya Black, is a natural person and a resident and citizen of Illinois, where she intends to remain, with a principal residence in Dixon, Lee County. She is a patient of KSB and a victim of Defendant's unauthorized Disclosure of Private Information.*

**Response:** Defendant admits that Plaintiff Tonya Black is a citizen of Illinois and, upon information and belief, admits that she was a patient of KSB. Defendant denies all remaining allegations in Paragraph 33.

34. *Plaintiff, Kenneth Weinstock, is a natural person and a resident and citizen of Illinois, where he intends to remain, with a principal residence in Dixon, Lee County. He is a patient of KSB and a victim of Defendant's unauthorized Disclosure of Private Information.*

**Response:** Defendant admits that Plaintiff Kenneth Weinstock is a citizen of Illinois and, upon information and belief, admits that he was a patient of KSB. Defendant denies all remaining allegations in Paragraph 34.

35. *Defendant, KSB Hospital Foundation d/b/a KSB Hospital f/k/a Katherine Shaw Bethea Hospital ("KSB" or "Defendant"), is a non-profit independent healthcare corporation organized and existing under the laws of the State of Illinois with its principal place of business at 403 E. First Street, Dixon, Illinois 61021 in Lee County.*

**Response:** Defendant admits that it was formerly known as Katherine Shaw Bethea Hospital, was organized under the laws of the State of Illinois, and admits that its principal place of business is at 403 E. First Street, Dixon, Illinois 61201 in Lee County. Defendant denies the remaining allegations in Paragraph 35 and refers to n.1 regarding Defendant's current organization and business name.

**JURISDICTION AND VENUE**

36. *This Court has subject matter jurisdiction over the subject matter over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States and under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or*

*value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class and at least one member o the class is a citizen of a state different from Defendant.*

**Response:** Defendant denies the allegations in Paragraph 36.

37. *This Court has personal jurisdiction over Defendant because its principal place of business is in this District and a substantial portion of the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.*

**Response:** Defendant denies the allegations in Paragraph 37.

38. *Venue is proper in this judicial district under 28 U.S.C. § 1391 (a) through (d) because: (i) a substantial part of the events giving rise to this action occurred in this judicial district including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the Disclosure of Plaintiffs' and Class members' Private Information; (ii) Defendant's principal place of business is located in this judicial district; (iii) Defendant collects and redistributes Class members' Private Information in this judicial district and (iv) Defendant caused harm to Class members residing in this judicial district.*

**Response:** Defendant denies the allegations in Paragraph 38.

## COMMON FACTUAL ALLEGATIONS

39. *KSB, headquartered in Dixon, Illinois, is a healthcare provider that offers a full range of medical services including hospital medicine, birth place, medical imaging, intensive care unit, wound care, cardiology, surgery, laboratory and home health care.*[26]

**Response:** Defendant admits the allegations in Paragraph 39.

40. *KSB operates "KSB Hospital" a "not-for-profit, independent healthcare provider…[which has] grown and evolved into today's acute care hospital, [a] regional network of primary care clinics, and a multi-specialty physician group. Each year [KSB] reinvest[s] in technology, facilities, and [its] employees in order to continue to meet the changing healthcare needs of [KSB's] hometowns."*[27]

**Response:** Defendant admits that it operates on a not-for-profit basis and refers to n.1 regarding Defendant's current organization and business name. Defendant admits that its previous website, www.ksbhospital.com/about, contained statements as altered in Paragraph 40 and denies that these statements provide Plaintiffs any basis for relief.

[26] https://www.ksbhospital.com/locations/ksbhospital
[27] https://www.ksbhospital.com/about

41. *KSB serves many of its patients via its Website and Online Platforms, which it encourages patients to use to find healthcare services and providers, access information about specific health conditions, request appointments, and more.*[28] *It promotes the comprehensive functionality of these tools and promotes their use, in service of its own goal of increasing profitability.*

**Response:** Defendant denies the allegations in Paragraph 41.

42. *Defendant promotes the comprehensive functionality of these tools and promotes their use, in service of its own goal of increasing profitability. In furtherance of that goal, Defendant purposely installed the Meta Pixel and other trackers onto its Website, for the purpose of gathering information about Plaintiffs and Class Members to further its marketing efforts and profits. But Defendant did not only generate information for its own use: it also shared patient information, including Private Information belonging to Plaintiffs and Class Members, with Facebook, and other unauthorized third parties.*

**Response:** Defendant denies the allegations in Paragraph 42.

43. *To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.*

**Response:** Paragraph 43 contains a statement prefacing further allegations. To the extent a response is required, Defendant denies the allegations in Paragraph 43.

44. *Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.*[29]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 44 and therefore denies the allegations.

45. *In conjunction with its advertising business, Facebook encourages and promotes its "Business Tools" to be used to gather customer data, identify customers and potential customers, target advertisements to those individuals, and market products and services.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 45 and therefore denies the allegations.

46. *Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.*

---

[28]

[29] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 46 and therefore denies the allegations.

47. *The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, clicks a button, fills out a form, and more.*[30] *Businesses that want to target customers and advertise their services can also create their own tracking parameters by building a "custom event."*[31]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 47 and therefore denies the allegations.

48. *The Meta Pixel is a Business Tool used to "track[] the people and type of actions they take" on an website.*[32] *When an individual accesses a webpage containing the Meta Pixel, the communications with that webpage are instantaneously and surreptitiously duplicated and sent to Facebook, traveling directly from the user's browser to Facebook's server, based off instructions from the Meta Pixel.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 48 and therefore denies the allegations.

49. *Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy, such as a homepage, and disable it on pages that do implicate patient privacy, such as Defendant's "Find a Provider" page.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 49 and therefore denies the allegations.

50. *The Meta Pixel's primary purpose is to enhance online marketing, improve online ad targeting, and generate sales.*[33].

---

[30] Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); *see also* Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App EVENTS API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/

[31] About Standard and Custom Website Events, META, https://www.facebook.com/business/help/964258670337005; *see also* Facebook, App Events API, *supra*.

[32] RETARGETING, META, https://www.facebook.com/business/goals/retargeting.

[33] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 50 and therefore denies the allegations.

51. *Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."*[34]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 51 and therefore denies the allegations.

52. *According to Facebook, the Meta Pixel can collect the following data.*

> ***Http Headers*** *– Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and* ***person using the website.*** *[Emphasis added.]*
>
> ***Pixel-specific Data*** *– Includes Pixel ID and the Facebook Cookie.*
>
> ***Button Click Data*** *– Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.*
>
> ***Optional Values*** *– Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.*
>
> ***Form Field Names*** *– Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.*[35]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 52 and therefore denies the allegations.

53. *Facebook boasts to its prospective users that the Meta Pixel can be used to:*

- ***Make sure your ads are shown to the right people.*** *Find new customers, or people who have visited a specific page or taken a desired action on your website.*

[34] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153
[35] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/

- ***Drive more sales****. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.*

- ***Measure the results of your ads.*** *Better understand the impact of your ads by measuring what happens when people see them.*[36]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 53 and therefore denies the allegations.

54. *Facebook likewise benefits from Meta Pixel data and uses it to enhance its own ad targeting abilities.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 54 and therefore denies the allegations.

55. *Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 55 and therefore denies the allegations.

56. *Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 56 and therefore denies the allegations.

57. *Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.*[37]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 57 and therefore denies the allegations.

---

[36] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153

[37] "Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/

58. *GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 58 and therefore denies the allegations.

59. *When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information. The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 59 and therefore denies the allegations.

60. *Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 60 and therefore denies the allegations.

61. *Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 61 and therefore denies the allegations.

62. *In this way, the Meta Pixel acts much like a traditional wiretap: intercepting and transmitting communications intended only for the website host and diverting them to Facebook.*

**Response:** Defendant denies the allegations in Paragraph 62.

63. *Separate from the Meta Pixel, third parties place cookies in the browsers of web users. These cookies can uniquely identify the user, allowing the third party to track the user as the browse the internet—on the third-party site and beyond. Facebook uses its own cookie to identify users of a Meta-Pixel-enabled website and connect their activities on that site to their individual identity. As a result, when a Facebook account holder uses a website with the Meta Pixel, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the user associated with the information it has intercepted.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 63 and therefore denies the allegations.

64. *With substantial work and technical know-how, internet users can sometimes circumvent these browser-based wiretap technologies. To counteract this, third parties bent on gathering data implement workarounds that are difficult for web users to detect or evade. Facebook's workaround is Conversions API, which "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."*[38] *This makes Conversions API a particularly effective tool because it allows sends Facebook data directly from the website server to Facebook, without relying on the user's web browser. Notably, client devices do not have access to host servers containing Conversions API, and thus, they cannot prevent (or even detect) this transmission of information to Facebook.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 64 and therefore denies the allegations.

65. *While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the website server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with Facebook] that the pixel may lose."*[39] *Consequently, if a website owner utilizes the Meta Pixel on its website, it is also reasonable to infer that it implemented the Conversions API on its website server(s), in accordance with Facebook's documentation.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 65 and therefore denies the allegations.

66. *The Meta Pixel, Conversions API, and other third-party trackers do not provide any substantive content on the host website. Rather, their only purpose is to collect information to be used for marketing and sales purposes.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 66 and therefore denies the allegations.

67. *Accordingly, without any knowledge, authorization, or action by a user, a website owner can use its website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Facebook and others.*

---

[38] About Conversions API, META, https://www.facebook.com/business/help/2041148702652965

[39] *See* Best Practices for Conversions API, META, https://www.facebook.com/business/help/308855623839366

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 67 and therefore denies the allegations.

68. *In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.*

**Response:** Defendant denies the allegations in Paragraph 68.

69. *Consequently, when Plaintiffs and Class Members visited Defendant's Website and communicated their Private Information, it was simultaneously intercepted and transmitted to Facebook.*

**Response:** Defendant denies the allegations in Paragraph 69.

70. *Defendant also employed other trackers, including Google Analytics with Google Tag Manager ("GTM"), Innovid, and CallRail, which, on information and belief likewise transmitted Plaintiffs' and the Class Members' Private Information to third parties without Plaintiffs' and Class Members' knowledge or authorization.*

**Response:** Defendant admits that it has used a program named Google Analytics. Defendant denies the characterization of Google Analytics as a "tracker" and denies all remaining allegations in Paragraph 70.

71. *Most basically, "Google Analytics is a platform that collects data from your websites and apps to create reports that provide insights into your business."*[40] *Once a business implants the Google Analytics tracking measurement code on a its website, every time a user visits a webpage, the tracking code will collect information about how that user interacted with the page.*[41]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 71 and therefore denies the allegations.

72. *Google Analytics allows Defendant to track and share with Google (1) who uses its website; (2) what is performed on its website; (3) when users visit its website; (4) where on the website users perform these actions; and (5) how users navigate through the website to perform*

[40] Google, *Analytics Help, Introduction to Analytics How Google Analytics works*, avail. at https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=3016588406699844463-NC

[41] *Id*.

*these actions. Google gathers this information using trackers embedded on KSB's Website and generates corresponding reports.*[42]

**Response:** Defendant denies the allegations in Paragraph 72.

73. *To help Google generate reports (usually in realtime), trackers embedded in a website send Google (1) information about the user's device; (2) client- and user-specific identifiers; and (3) information about what event the user performed.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 73 and therefore denies the allegations.

74. *According to Google, "Google Tag Manager is a tag management system (TMS) that allows you to quickly and easily update measurement codes and related code fragments collectively known as* ***tags*** *on your website or mobile app. Once the small segment of Tag Manager code has been added to your project, you can safely and easily deploy analytics and measurement tag configurations from a web-based user interface."*[43]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 74 and therefore denies the allegations.

75. *As Google goes onto describe:*

> *When Tag Manager is installed, your website or app will be able to communicate with the Tag Manager servers. You can then use Tag Manager's web-based user interface to set up tags, establish* ***triggers*** *that cause your tag to fire when certain events occur, and create* ***variables*** *that can be used to simplify and automate your tag configurations.*
>
> *A collection of tags, triggers, variables, and related configurations installed on a given website or mobile app is called a* ***container****. A Tag Manager container can replace all other manually-coded tags on a site or app, including tags from Google Ads, Google Analytics, Floodlight, and 3rd party tags.*[44]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 75 and therefore denies the allegations.

---

[42] *See generally*, MarketLyrics, *A big list of what Google Analytics can & cannot do*, avail. at https://marketlytics.com/blog/list-of-things-google-analytics-can-and-cannot-do/

[43] *See Google Tag Manager Overview,* available at https://support.google.com/tagmanager/answer/6102821?hl=EN#:~:text=Google%20Tag%20Manager%20is%20a,your%20website%20or%20mobile%20app

[44] *Id*.

76. *Defendant also utilizes Innovid, which was formerly TVSquared, Innovid is a tool used to track how effective video/tv advertising is. KSB was likely using Innovid to measure the effectiveness of a video advertising campaign.*

**Response:** Defendant denies the allegations in Paragraph 76.

77. *Further, Defendant utilizes CallRail, a tool used to compare advertising campaigns' effectiveness. CallRail does this by attributing unique phone numbers to specific ad campaigns or traffic sources. CallRail determines that a user clicked on or viewed a particular ad. CallRail will dynamically change the phone numbers the user sees on the website to the ad specific phone number. CallRail also inserts hidden data into contact forms and online chat tools. KSB was sending CallRail the referrer and current URLS, identifying information, and users' Google Analytic IDs.*

**Response:** Defendant denies the allegations in Paragraph 77.

78. *On information and belief, through these other trackers, Google Analytics with GTM, Innovid, and CallRail, Defendant transmitted Plaintiffs' and the Class Members' Private Information to Facebook and those other third parties without Plaintiffs' and Class Members' knowledge or authorization.*

**Response:** Defendant denies the allegations in Paragraph 78.

79. *KSB lists "Patient's Rights and Responsibilities" ("Patient Rights") and maintains a "Notice of Privacy Practices" ("Privacy Policy") which are both posted and maintained on Defendant's Website.*[45]

**Response:** The allegations in Paragraph 79 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

80. *In its enumerated Patient's Rights, KSB acknowledges that "each patient has a right to: [r]eceive safe care that respects your confidentiality and your personal privacy, values, and beliefs."*[46] *KSB further notes patients "have the right to know about hospital policies and procedures."*[47]

---

[45] *See* KSB Patient Rights and Responsibilities, available at https://www.ksbhospital.com/your-rights-and-responsibilities/, and KSB Notice of Privacy Practices, available at https://www.ksbhospital.com/wordpress2017/wp-content/uploads/2023/07/npp_booklet_hc_provider-64a2ee1500642.pdf, attached as **Exhibits B** and **C,** respectively**.**
[46] **Ex. B.**
[47] *Id*.

**Response:** The allegations in Paragraph 80 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

81. *Defendant's Privacy Policy provides, "[t]his notice describes how medical information about you may be used and disclosed and how you can get access to this information."*

**Response:** The allegations in Paragraph 81 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

82. *KSB's Privacy Policy further states, "**In these cases we never share your information unless you give us written permission:** • Marketing purposes. • Sale of your information • Most sharing of psychotherapy Notes."*[48]

**Response:** The allegations in Paragraph 82 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

83. *Therein, KSB further acknowledges, represents and promises:*

***Our Responsibilities***

- *We are required by law to maintain the privacy and security of your protected health information.*

- *We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information.*

- *We must follow the duties and privacy practices described in this notice and give you a copy of it.*

- *We will not use or share your information other than as described here unless you tell us we can in writing. If you tell us we can, you can change your mind at any time. Let us know if you change your mind.*[49]

[48] **Exhibit C** (emphasis in original).
[49] *Id*.

**Response:** The allegations in Paragraph 83 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

84. *On information and belief, KSB does not maintain any other online website user policy that otherwise governs or discloses to its patients and its website users how KSB collects and uses their personal information when visiting the Website.*

**Response:** The allegations in Paragraph 84 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

85. *Despite these representations in its privacy policies Defendant does, indeed transfer Private Information including PHI to third parties for marketing purposes, without written authorization, and without patients' knowledge. Using the Meta Pixel and other tracking technologies, such as Google Analytics with Google Tag Manager ("GTN"), Innovid and CallRail, Defendant used and disclosed Plaintiffs' and Class Members' Private Information and confidential communications to Facebook, and other unauthorized third parties, without written authorization, win violation of KSB's privacy policies.*

**Response:** The first sentence in Paragraph 85 only concerns claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations. Defendant denies the remaining allegations Paragraph 85.

86. *Defendant disclosed Plaintiffs' and Class Members' Private Information and confidential communications to Facebook and other third parties including Google, CallRail, and Innovid via the Meta Pixel and other tracking technologies, without Plaintiffs' and Class Members' authorization, for marketing purposes.*

**Response:** Defendant denies the allegations in Paragraph 86.

87. *On information and belief, the information that Defendant's Meta Pixel, and possibly CAPI, sent to Facebook included the Private Information that Plaintiffs and the Class Members submitted to Defendant's Website and Online Platforms, including, inter alia: (i) patients' search activities; (ii) content that patients browsed; (iii) financial related activities; and (iv) patient portal and medical record related activities.*

**Response:** Defendant denies the allegations in Paragraph 87.

88. *KSB did this through PageView, Microdata, and SubscribedButtonClick events. In each of the transmitted Meta Pixel events, KSB included the "c_user" cookie, which Facebook uses to identify users.*

**Response:** Defendant denies the allegations in Paragraph 88.

89. *Upon a patient's arrival on the KSB homepage, KSB began its disclosures of patient activities by sending Facebook PageView and Microdata events. The events inform Facebook that the patient was on "https://www.ksbhospital.com/", a page about the "Katherine Shaw Bethea Hospital – KSB – Dixon, Illinois." Id.*

**Response:** Defendant denies the allegations in Paragraph 89.

90. *Then, as the patient moved from the homepage to conduct a search for "colonoscopy," KSB reported that activity via a pair of PageView and Microdata events.. The Microdata event informs Facebook that the patient "searched for colonoscopy" on KSB's webpage.*

**Response:** Defendant denies the allegations in Paragraph 90.

91. *KSB continued to inform Facebook as the patient navigated through their colonoscopy search results.*

**Response:** Defendant denies the allegations in Paragraph 91.

92. *For example, when the patient loaded a page about gastroenterology, KSB transmitted PageView and Microdata events, which divulge the patient was on a page about "medical services/gastroenterology" after conducting a search for "colonoscopy."*

**Response:** Defendant denies the allegations in Paragraph 92.

93. *KSB further disclosed through a SubscribedButtonClick event when the patient clicked the "CONTACT US" button to call KSB. The event disclosed that the patient clicked to call KSB from the "medical_services/gastroenterology" page after searching for "colonoscopy," as shown below:*




**Response:** Defendant denies the allegations in Paragraph 93.

94. *In addition to information about patients' search activities, KSB also disclosed to Facebook information about other types of browsing activities on KSB's website.*

**Response:** Defendant denies the allegations in Paragraph 94.

95. *One example of patient browsing activity is the review of and registration for classes KSB offered. As a patient navigated through KSB's website to view events, learn more about childbirth classes, and signed up for a class, KSB shared these activities with Facebook.*

**Response:** Defendant denies the allegations in Paragraph 95.

96. *First, upon a patient visiting KSB's events page, KSB sent PageView and Microdata events to Facebook. The Microdata event divulges that the patient was viewing KSB's "Events from November 14 – April 25, 2024."*

**Response:** Defendant denies the allegations in Paragraph 96.

97. *Next, KSB disclosed as the patient clicked on a specific class of interest. For example, when the patient clicked to view a Childbirth Education class, KSB transmitted PageView and Microdata events. The Microdata event informs Facebook both the name of the class, "Childbirth Education – KSB Hospital," as well as the date of the class, "2024-01-20/," as shown below:*




**Response:** Defendant denies the allegations in Paragraph 97.

98. *KSB then disclosed when the patient selected the course. When the patient clicked to add the Childbirth Education class to their calendar, KSB sent a SubscribedButtonClick event, informing Facebook the patient clicked a button labeled "Add to Calendar" while they were on the page for "event/childbirth-education/2024-01-20/."*

**Response:** Defendant denies the allegations in Paragraph 98.

99. *After the patient clicked to add the class to their calendar, KSB routed the user to a different website, Eventbrite.com. From there, the patient could complete the registration for KSB's course. The details of the user's Eventbrite.com activities were disclosed by Eventbrite to Facebook while the patient completed their registration for KSB's course.*

**Response:** Defendant denies the allegations in Paragraph 99.

100. *Upon the patient loading the Eventbrite page, a PageView event was transmitted. Then, when the patient clicked to sign up for the class, a SubscribedButtonClick was sent revealing the user selected "KSB Childbirth Education Class" to obtain "ksb-childbirth-education-class-tickets." As the patient navigated to view the class details, clicked to get tickets, submitted their contact information, and finalized their registration, Eventbrite disclosed each of those activities through SubscribedButtonClick, PageView, and/or Microdata events.*

**Response:** Defendant denies the allegations in Paragraph 100.

101. *Certain of Eventbrite's transmitted events revealed a substantial amount of information about the patient. For example, when the patient initially clicked to get tickets for the class, the SubscribedButtonClick event that was sent discloses that the patient chose to get the "KSB Childbirth Education Class Tickets, Sat, Jan 20, 2024 at 9:00 AM.". Moreover, Eventbrite had Advanced Matching Parameters enabled, and sent hashed versions of the user's entered first name, last name, email, phone number, city, zip code, and external ID in certain of the transmitted events.*

**Response:** Defendant denies the allegations in Paragraph 101.

102. *KSB additionally shared information about patients' financial related activities.*

**Response:** Defendant denies the allegations in Paragraph 102.

103. *For example, KSB reported about patient bill pay activities as soon as the patient clicked to pay their bill online, upon which KSB transmitted a SubscribedButtonClick event. The SubscribedButtonClick event reveals the patient clicked to "PAY MY BILL ONLINE" on the page, "Financial Services – KSB Hospital."*

**Response:** Defendant denies the allegations in Paragraph 103.

104. *As the patient navigated through KSB's instructions to pay their bill, KSB disclosed each one of those steps through a series of PageView, Microdata, and SubscribedButtonClick events.*

**Response:** Defendant denies the allegations in Paragraph 104.

105. *First, when the patient arrived on KSB's bill pay page, KSB transmitted as set of PageView and Microdata events to disclose that activity.*

**Response:** Defendant denies the allegations in Paragraph 105.

106. *From the bill pay page, the patient had the option of clicking to pay their medical bill or learning more about their healthcare bill. When the patient clicked to pay their bill, KSB disclosed that by sending a SubscribedButtonClick, which confirmed the patient clicked to "PAY YOUR MEDICAL BILL."*

**Response:** Defendant denies the allegations in Paragraph 106.

107. *Next, KSB confirmed when the patient arrived on the page where they can pay their bill online by sending a pair of PageView and Microdata events, revealing the patient was on the page to "pay-your-medical-bill/." Finally, when the user clicked "Pay My Bill" to navigate to "https://www/personapay.com/ksb/login" KSB sent another SubscribedButtonClick event, informing Facebook the patient's click.*

**Response:** Defendant denies the allegations in Paragraph 107.

108. *KSB also disclosed when patients conducted other financial activities.*

**Response:** Defendant denies the allegations in Paragraph 108.

109. *For instance, when a patient clicked to estimate costs or to learn about financial assistance, KSB sent SubscribedButtonClick events for each activity. The SubscribedButtonClick events revealed that the patient clicked to either "ESTIMATE MY COST" or "LEARN ABOUT FINANCIAL ASSISTANCE," respectively.*

**Response:** Defendant denies the allegations in Paragraph 109.

110. *In another example, when a patient viewed the Financial Assistance page, KSB sent PageView and Microdata events, confirming that the patient was on a page for "financial-services/financial-assistance."*

**Response:** Defendant denies the allegations in Paragraph 110.

111. *Not only did KSB share information about patients' search, browsing, and financial activities, but KSB also sent information to Facebook about patients' activities revealing their status as potential patients.*

**Response:** Defendant denies the allegations in Paragraph 111.

112. *One example of this type of activity is patient portal activities.*

**Response:** Defendant denies the allegations in Paragraph 112.

113. *As soon as a patient loaded the page about the patient portal, KSB sent PageView and Microdata events, divulging that the patient was on the "Patient Portal – KSB Hospital" page where the patient can "Access your health records anytime."*

**Response:** Defendant denies the allegations in Paragraph 113.

114. *When a patient clicked to log into the patient portal to use the health management tool, KSB sent a SubscribedButtonClick event. The SubscribedButtonClick event informs Facebook that the patient clicked "LOG IN" which leads to the URL: "https://ksb.iqhealth.com/."*

**Response:** Defendant denies the allegations in Paragraph 114.

115. *Separately, KSB also shares when patients request medical records outside of the patient portal.*

**Response:** Defendant denies the allegations in Paragraph 115.

116. *When a patient opened the Medical Records page, where the patient may either request a print or online version of a medical release authorization form, KSB sent a pair of PageView and Microdata events. The events divulge to Facebook that the patient was on a page about "medical-records/."*

**Response:** Defendant denies the allegations in Paragraph 116.

117. *KSB then informed Facebook when the patient selected to either request the print or online version of the medical release authorization form.*

**Response:** Defendant denies the allegations in Paragraph 117.

118. *If the patient clicked to access the print version of the form, KSB sent a SubscribedButtonClick informing Facebook the patient clicked "AUTHORIZATION FOR RELEASE OF MEDICAL INFROMATION – PRINTABLE FORM," which loads the file, "Release-of-Medical-Information-6_1_2023.pdf."*

**Response:** Defendant denies the allegations in Paragraph 118.

119. *Similarly, when the patient opened the page with the online version of the authorization form, KSB informed Facebook about that too. The PageView and Microdata events KSB sent revealed that the patient was on a page for "medical-records/online-roi-form" where the patient can make an "Online Request of Medical Record Information" if the user "complete[d] the below form to request your Medical Information."*

**Response:** Defendant denies the allegations in Paragraph 119.

120. *Finally, when the patient submitted the online authorization form, KSB informed Facebook about that too, by sending a SubscribedButtonClick event confirming that the patient clicked to "Submit" a form for "medical-records/online-roi-form/."*

**Response:** Defendant denies the allegations in Paragraph 120.

121. *After receiving this information from Defendant, Facebook processes it, analyzes it, and assimilates it into its own massive datasets, before selling access to this data in the form of targeted advertisements. Employing "Audiences"—subsections of individuals identified as*

*sharing common traits—Facebook promises the ability to "find the people most likely to respond to your ad."*[50] *Advertisers can purchase the ability to target their ads based on a variety of criteria: "Core Audiences," individuals who share a location, age, gender, and/or language;*[51] *"Custom Audiences," individuals who have taken a certain action, such as visiting a website, using an app, or buying a product bought a product;*[52] *and/or "Lookalike Audiences," groups of individuals who "resemble" a Custom Audience, and who, as Facebook promises, "are likely to be interested in your business because they're similar to your best existing customers.*[53]

**Response:** Defendant denies the allegations in Paragraph 121.

122. *Defendant could have chosen not to use the Meta Pixel, or it could have configured it to limit the information that it communicated to Facebook, but it did not. Instead, it intentionally selected and took advantage of the features and functionality of the Pixel that resulted in the Disclosure of Plaintiffs' and Class Members' Private Information.*

**Response:** Defendant denies the allegations in Paragraph 122.

123. *Defendant used and disclosed Plaintiffs' and Class Members' Private Information to Facebook, Google, Innovid, CallRail, and possibly other third parties for the purpose of marketing its services and increasing its profits.*

**Response:** Defendant denies the allegations in Paragraph 123.

124. *On information and belief, Defendant shared, traded, or sold Plaintiffs' and Class Members' Private Information with Facebook and others in exchange for improved targeting and marketing services and reduced marketing costs.*

**Response:** Defendant denies the allegations in Paragraph 124.

125. *Plaintiffs never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information for marketing purposes. Plaintiffs were never provided with any written notice that Defendant regularly disclosed its patients' Protected Health Information to Facebook Google, Innovid, and CallRail, nor were they provided any means of opting out of such disclosures. Defendant, nonetheless, knowingly disclosed Plaintiffs' Protected Health Information to unauthorized entities and used that information for its own gain.*

**Response:** Defendant denies the allegations in Paragraph 125.

126. *Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.*

---

[50] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting
[51] *Id.*
[52] *Id.*
[53] How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Help Center, https://www.facebook.com/business/help/465262276878947

**Response:** Defendant denies the allegations in Paragraph 126.

127. *Defendant actively misrepresented that it would preserve the security and privacy of Plaintiffs' and Class Members' Private Information. In actuality, Defendant shared data about Plaintiffs' and Class Members' activities on the Online Platforms alongside identifying details about the Plaintiffs and Class Members, such as their IP addresses.*

**Response:** Defendant denies the allegations in Paragraph 127.

128. *By law, Plaintiffs and the Class Members are entitled to privacy in their Protected Health Information and confidential communications. KSB deprived Plaintiffs and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private Information to unauthorized, third-party eavesdroppers, including Facebook and others; (3) profited from the Disclosure; and (4) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent.*

**Response:** Defendant denies the allegations in Paragraph 128.

129. *Plaintiff Chloe Noftz is a patient of Defendant and received healthcare services from KSB and physicians in KSB's network, specifically at the Dixon, Illinois location. She relied on KSB's Online Platforms to communicate confidential patient information.*

**Response:** Defendant admits that Plaintiff Chloe Noftz was a patient of KSB and received healthcare services. Defendant lacks knowledge or information sufficient to form a belief about the physicians' network and the location of the services. Defendant denies the remaining allegations in Paragraph 129.

130. *Plaintiff Noftz has been a Facebook user for at least three years.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 130 and therefore denies the allegations.

131. *Plaintiff Noftz accessed Defendant's Online Platforms at Defendant's direction and encouragement. Plaintiff Noftz reasonably expected that her online communications with KSB were confidential, solely between herself and KSB, and that, as such, those communications would not be transmitted to or intercepted by a third party.*

**Response:** Defendant denies the allegations in Paragraph 131.

132. *Plaintiff Noftz utilized and accessed Defendant's Online Platforms in order to manage her treatment for a broken toe. Plaintiff Noftz would regularly use Defendant's Online Platforms to check medical bills and to view different test results.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 132 and therefore denies the allegations.

133. *Following Plaintiff Noftz's use of Defendant's Online Platforms, she noticed that she was receiving targeted ads regarding Defendant's health plans. This caused Plaintiff Noftz some concern and she refused to utilize Defendant's Online Platforms following the targeted ads appearing on Facebook.*

**Response:** Defendant denies the allegations in Paragraph 133.

134. *Plaintiff Noftz provided her Private Information to Defendant and trusted that the information would be safeguarded according to KSB's privacy policies and the law.*

**Response:** Defendant denies the allegations in Paragraph 134.

135. *As described herein, by use of the Meta Pixel and tracking technology, KSB sent Plaintiff Noftz's Private Information to Facebook and others when she used Defendant's Online Platforms to communicate healthcare and identifying information to KSB.*

**Response:** Defendant denies the allegations in Paragraph 135.

136. *Pursuant to the process described herein, KSB assisted Facebook and potentially others in intercepting Plaintiff Noftz's confidential communications, including those that contained PII and PHI. KSB facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.*

**Response:** Defendant denies the allegations in Paragraph 136.

137. *Plaintiff never intended to sell her Private Information or would have permitted it to be made available for sale on the resale market.*

**Response:** Defendant denies the allegations in Paragraph 137.

138. *On information and belief, through its use of the Meta Pixel and other tracking technologies, KSB disclosed to Facebook:*

a. *The pages and content Plaintiff viewed;*

b. *Plaintiff's seeking of medical treatment;*

c. *Plaintiff's status as a patient;*

d. *Information regarding Plaintiff's patient portal activity;*

*e. The specialties of the medical providers Plaintiff searched for and viewed;*

*f. the names of the medical providers Plaintiff searched for and viewed;*

*g. the search results that Plaintiff clicked on;*

*h. the medical services Plaintiff viewed; and,*

**Response:** Defendant denies the allegations in Paragraph 138.

139. *By failing to receive the requisite consent, KSB breached confidentiality and unlawfully disclosed Plaintiff's Private Information.*

**Response:** Defendant denies the allegations in Paragraph 139.

140. *As a result of KSB's Disclosure of Plaintiff's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Plaintiff has suffered the following injuries:*

*a. Loss of privacy; unauthorized disclosure of her Private Information; unauthorized access of her Private Information by third parties;*

*b. Plaintiff now receives targeted health-related advertisements on Facebook, reflecting her private medical treatment information;*

*c. Plaintiff paid KSB for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Plaintiff did not receive the privacy and security protections for which she paid, due to Defendant's Disclosure;*

*d. The portion of KSB's revenues and profits attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;*

*e. The portion of KSB's savings in marketing costs attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;*

*f. The portion of KSB's revenues and profits attributable to serving and monetizing advertisements directed to Plaintiff as a result of collecting Plaintiff's Private Information without authorization and sharing it with third parties;*

*g. Value to Plaintiff of surrendering her choice to keep her Private Information private and allowing KSB to track her data;*

*h. Embarrassment, humiliation, frustration, and emotional distress;*

*i. Decreased value of Plaintiff's Private Information;*

j. *Lost benefit of the bargain;*

k. *Increased risk of future harm resulting from future use and disclosure of her Private Information; and*

l. *Statutory damages.*

**Response:** Defendant denies the allegations in Paragraph 140.

141. *Plaintiff Tonya Black is a patient of Defendant and received healthcare services from KSB and physicians in KSB's network, specifically an OBGYN in a KSB hospital. She relied on KSB's Online Platforms to communicate confidential patient information.*

**Response:** Defendant admits that Plaintiff Tonya Black was a patient of KSB and received healthcare services. Defendant lacks knowledge or information sufficient to form a belief about the physicians' network she used and the treatments received. Defendant denies the remaining allegations in Paragraph 141.

142. *Plaintiff has been a Facebook user for eight years.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 142 and therefore denies the allegations.

143. *Plaintiff Black accessed Defendant's Online Platforms at Defendant's direction and encouragement. Plaintiff Black reasonably expected that her online communications with KSB were confidential, solely between herself and KSB, and that, as such, those communications would not be transmitted to or intercepted by a third party.*

**Response:** Defendant denies the allegations in Paragraph 143.

144. *Plaintiff Black utilized and accessed Defendant's patient portal for a variety of reasons – to view test results, schedule appointments, and track her prescriptions. Additionally, Plaintiff Black utilized Defendant's website to locate phone numbers for her OBGYN and primary care doctor.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 144 and therefore denies the allegations.

145. *Plaintiff Black provided her Private Information to Defendant and trusted that the information would be safeguarded according to KSB's privacy policies and legal obligations.*

**Response:** Defendant denies the allegations in Paragraph 145.

146. *As described herein, by use of the Meta Pixel and tracking technology, KSB sent Black's Private Information to Facebook and others when she used Defendant's Online Platforms to communicate healthcare and identifying information to KSB.*

**Response:** Defendant denies the allegations in Paragraph 146.

147. *Pursuant to the process described herein, KSB assisted Facebook and others with intercepting Plaintiff Black's confidential communications, including those that contained PII and PHI. KSB facilitated these interceptions without Plaintiffs' knowledge, consent, or express written authorization.*

**Response:** Defendant denies the allegations in Paragraph 147.

148. *Plaintiff never intended to sell her Private Information or would have permitted it to be made available for sale on the resale market.*

**Response:** Defendant denies the allegations in Paragraph 148.

149. *On information and belief, through its use of the Meta Pixel and other tracking technologies, KSB disclosed to Facebook:*

*a. The pages and content Plaintiff viewed;*

*b. Plaintiff's seeking of medical treatment;*

*c. Plaintiff's status as a patient;*

*d. Information regarding Plaintiff's patient portal activity;*

*e. The specialties of the medical providers Plaintiff searched for and viewed;*

*f. the names of the medical providers Plaintiff searched for and viewed;*

*g. the search results that Plaintiff clicked on;*

*h. the medical services Plaintiff viewed; and,*

**Response:** Defendant denies the allegations in Paragraph 149.

150. *By failing to receive the requisite consent, KSB breached confidentiality and unlawfully disclosed Plaintiff's Private Information.*

**Response:** Defendant denies the allegations in Paragraph 150.

151. *As a result of KSB's Disclosure of Plaintiff's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Plaintiff has suffered the following injuries:*

*a. Loss of privacy; unauthorized disclosure of her Private Information; unauthorized access of her Private Information by third parties;*

*b. Plaintiff now receives targeted health-related advertisements on Facebook, reflecting her private medical treatment information;*

*c. Plaintiff paid KSB for medical services and the services she paid for included reasonable privacy and data security protections for her Private Information, but Plaintiff did not receive the privacy and security protections for which she paid, due to Defendant's Disclosure;*

*d. The portion of KSB's revenues and profits attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;*

*e. The portion of KSB's savings in marketing costs attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;*

*f. The portion of KSB's revenues and profits attributable to serving and monetizing advertisements directed to Plaintiff as a result of collecting Plaintiff's Private Information without authorization and sharing it with third parties;*

*g. Value to Plaintiff of surrendering her choice to keep her Private Information private and allowing KSB to track her data;*

*h. Embarrassment, humiliation, frustration, and emotional distress;*

*i. Decreased value of Plaintiff's Private Information;*

*j. Lost benefit of the bargain;*

*k. Increased risk of future harm resulting from future use and disclosure of her Private Information; and*

*l. Statutory damages.*

**Response:** Defendant denies the allegations in Paragraph 151.

152. *Plaintiff Kenneth Weinstock is a patient of Defendant and received healthcare services from KSB and physicians in KSB's network, particularly at KSB Commerce Towers, KSB Hennapan, and a KSB emergency department. He relied on KSB's Online Platforms to communicate confidential patient information.*

**Response:** Defendant admits that Plaintiff Kenneth Weinstock was a patient of KSB and received healthcare services. Defendant lacks knowledge or information sufficient to form a belief

about the physicians' network and the location of the services. Defendant denies the remaining allegations in Paragraph 152.

153. *Plaintiff Weinstock has been a Facebook user since 2018.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 153 and therefore denies the allegations.

154. *Plaintiff Weinstock accessed Defendant's Online Platforms at Defendant's direction and encouragement. Plaintiff Weinstock reasonably expected that his online communications with KSB were confidential, solely between himself and KSB, and that, as such, those communications would not be transmitted to or intercepted by a third party.*

**Response:** Defendant denies the allegations in Paragraph 154.

155. *Plaintiff Weinstock utilized and accessed Defendant's patient portal to manage a variety of treatments for kidney stones, his physical therapy appointments, and general pain management. Plaintiff Weinstock also used Defendant's patient portal to view test results and appointment times. Plaintiff Weinstock also accessed Defendant's website to find a primary care doctor, hours of operations of different KSB locations, and leave reviews.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 155 and therefore denies the allegations.

156. *Following Plaintiffs' use of Defendant's Online Platforms, he began to notice targeted ads for KSB hospitals' pain management classes.*

**Response:** Defendant denies the allegations in Paragraph 156.

157. *Plaintiff Weinstock provided his Private Information to Defendant and trusted that the information would be safeguarded according to KSB's privacy policies and legal obligations.*

**Response:** Defendant denies the allegations in Paragraph 157.

158. *As described herein, by use of the Meta Pixel and tracking technology, KSB sent Weinstock's Private Information to Facebook and others when he used Defendant's Online Platforms to communicate healthcare and identifying information to KSB.*

**Response:** Defendant denies the allegations in Paragraph 158.

159. *Pursuant to the process described herein, KSB assisted Facebook and others with intercepting Plaintiff Weinstock's confidential communications, including those that contained PII and PHI. KSB facilitated these interceptions without Plaintiffs' knowledge, consent, or express written authorization.*

**Response:** Defendant denies the allegations in Paragraph 159.

160. *Plaintiff never intended to sell his Private Information or would have permitted it to be made available for sale on the resale market.*

**Response:** Defendant denies the allegations in Paragraph 160.

161. *On information and belief, through its use of the Meta Pixel and other tracking technologies, KSB disclosed to Facebook:*

*a. The pages and content Plaintiff viewed;*

*b. Plaintiff's seeking of medical treatment;*

*c. Plaintiff's status as a patient;*

*d. Information regarding Plaintiff's patient portal activity;*

*e. The specialties of the medical providers Plaintiff searched for and viewed;*

*f. the names of the medical providers Plaintiff searched for and viewed;*

*g. the search results that Plaintiff clicked on;*

*h. the medical services Plaintiff viewed; and,*

**Response:** Defendant denies the allegations in Paragraph 161.

162. *By failing to receive the requisite consent, KSB breached confidentiality and unlawfully disclosed Plaintiff's Private Information.*

**Response:** Defendant denies the allegations in Paragraph 162.

163. *As a result of KSB's Disclosure of Plaintiff's Private Information via the Meta Pixel and other tracking technologies to third parties without authorization, Plaintiff has suffered the following injuries:*

*a. Loss of privacy; unauthorized disclosure of his Private Information; unauthorized access of his Private Information by third parties;*

*b. Plaintiff now receives targeted health-related advertisements on Facebook, reflecting his private medical treatment information;*

*c. Plaintiff paid KSB for medical services and the services he paid for included reasonable privacy and data security protections for his Private Information, but Plaintiff did not receive the privacy and security protections for which he paid, due to Defendant's Disclosure;*

d. *The portion of KSB's revenues and profits attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;*

e. *The portion of KSB's savings in marketing costs attributable to collecting Plaintiff's Private Information without authorization and sharing it with third parties;*

f. *The portion of KSB's revenues and profits attributable to serving and monetizing advertisements directed to Plaintiff as a result of collecting Plaintiff's Private Information without authorization and sharing it with third parties;*

g. *Value to Plaintiff of surrendering her choice to keep his Private Information private and allowing KSB to track his data;*

h. *Embarrassment, humiliation, frustration, and emotional distress;*

i. *Decreased value of Plaintiff's Private Information;*

j. *Lost benefit of the bargain;*

k. *Increased risk of future harm resulting from future use and disclosure of her Private Information; and*

l. *Statutory damages.*

**Response:** Defendant denies the allegations in Paragraph 163.

164. *In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.*[54] *This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.*

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 164 and therefore denies the allegations.

165. *On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on*

---

[54] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.

*this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."*[55]

**Response:** Defendant denies the allegations in Paragraph 165. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any government report, Defendant denies that Plaintiffs are entitled to any relief based on said report.

166. *The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.*[56] *When a user was having her period or informed the app of her intention to get pregnant, Flo would inform Facebook, which could then use the data for targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about its secret sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."*[57]

**Response:** Defendant denies the allegations in Paragraph 166. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any government report, Defendant denies that Plaintiffs are entitled to any relief based on said report.

167. *More recently, Facebook employees admitted to lax protections for sensitive user data. In 2021, Facebook engineers on the ad business product team conceded "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"*[58]

**Response:** Defendant lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 167 and therefore denies the allegations.

---

[55] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021) https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.
[56] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.) https://slate.com/technology/2022/06/health-data-brokers-privacy.html.
[57] *Id.*
[58] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

168. *In June 2022, an investigation by The Markup*[59]*revealed that 33 of the top 100 hospitals in the nation had the Meta Pixel embedded on their websites.*[60] *On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data" including sensitive personal health information whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.*[61] *The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."*[62]

**Response:** Defendant denies the allegations in Paragraph 168, which purports to summarize a journalistic report, and denies that Plaintiffs are entitled to any relief based on the report or Plaintiffs' characterization thereof.

169. *During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites included patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, and patients' names, addresses, email addresses, and phone numbers.*[63]

**Response:** Defendant denies the allegations in Paragraph 169, which purports to summarize a journalistic report, and denies that Plaintiffs are entitled to any relief based on the report or Plaintiffs' characterization thereof.

170. *In addition to the 33 hospitals identified by The Markup as having installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.*[64]

**Response:** Defendant denies the allegations in Paragraph 170, which purports to summarize a journalistic report, and denies that Plaintiffs are entitled to any relief based on the report or Plaintiffs' characterization thereof.

---

[59] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. *See* www.themarkup.org/about

[60] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

171. *David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply troubled" by what the hospitals capturing and sharing patient data in this way.*[65]

**Response:** Defendant denies the allegations in Paragraph 171, which purports to summarize a journalistic report, and denies that Plaintiffs are entitled to any relief based on the report or Plaintiffs' characterization thereof.

172. *Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.*[66]

**Response:** Defendant denies the allegations in Paragraph 172. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

173. *Guidance from the U.S. Department of Health and Human Services ("HHS") instructs healthcare providers that patient status alone is protected by HIPAA.*

**Response:** Defendant denies the allegations in Paragraph 173. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

174. *In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:*

> *Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care*

---

[65] *Id.*

[66] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

*provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.*[67]

**Response:** Defendant denies the allegations in Paragraph 174. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

175. *In its guidance for Marketing, the Department further instructs:*

> *The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. ... Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).*[68]

**Response:** Defendant denies the allegations in Paragraph 175. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

176. *In addition, HHS's Office for Civil Rights (OCR) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.*[69]

---

[67] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[68] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[69] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

**Response:** Defendant denies the allegations in Paragraph 176. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

177. *According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."*[70]

**Response:** Defendant denies the allegations in Paragraph 177. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

178. *Citing The Markup's June 2022 article, the Bulletin expressly notes:*

> *Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors.* ***Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules****. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.*
>
> *An impermissible disclosure of an individual's PHI not only violates the Privacy Rulebut also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that*

---

[70] *Id.*

> *they disclose PHI* ***only*** *as expressly permitted or required by the HIPAA Privacy Rule.*[71]

**Response:** Defendant denies the allegations in Paragraph 178. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

179. *In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel violates HIPAA Rules.*

**Response:** Defendant denies the allegations in Paragraph 179.

180. *The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."*[72]

**Response:** The allegations in Paragraph 180 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

181. *On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."*[73]

**Response:** The allegations in Paragraph 181 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

182. *Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible*

---

[71] *Id.* (emphasis in original) (internal citations omitted).

[72] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **attached as Exhibit A.**

[73] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

*disclosures of PHI to third parties or any other violations of the HIPAA Rules"*[74] *and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."*[75]

**Response:** The allegations in Paragraph 182 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

183. *Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. Id. According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, including sharing of covered information without an individual's authorization, triggers notification obligations under the Rule."*[76]

**Response:** The allegations in Paragraph 183 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

184. *Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."*[77]

---

[74] *Id.*
[75] *Id.*
[76] Statement of the Commission: On Breaches by Health Apps and Other Connected Devices, U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).
[77] *See, e.g.,* U.S. v. Easy Healthcare Corp., Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; In the Matter of BetterHelp, Inc., FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; U.S. v. GoodRx Holdings, Inc., Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; In the Matter of Flo Health Inc., FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

**Response:** The allegations in Paragraph 184 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

185. *As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.*

**Response:** The allegations in Paragraph 185 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

186. *A medical provider's duty of confidentiality is a cardinal rule, embedded in doctor-patient and hospital-patient relationships.*

**Response:** The allegations in Paragraph 186 constitute a legal conclusion to which no response is required. To the extent any response is deemed required, Defendant denies the allegations.

187. *The American Medical Association's ("AMA") Code of Medical Ethics requires the protection of patient privacy and communications, and these rules are applicable to KSB and its physicians.*

**Response:** The allegations in Paragraph 187 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

188. *AMA Code of Ethics Opinion 3.1.1 provides:*

> *Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).*

**Response:** The allegations in Paragraph 188 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

189. *AMA Code of Medical Ethics Opinion 3.2.4 provides:*

> *Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.*

**Response:** The allegations in Paragraph 189 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

190. *AMA Code of Medical Ethics Opinion 3.3.2 provides:*

> *Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.*

**Response:** The allegations in Paragraph 190 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

191. *Under the Illinois Medical Patient Rights Act ("MPRA"), 410 Ill. Comp. Stat. 50/3(d), Plaintiff and Class Members have rights to privacy and confidentiality in their health care.*

**Response:** The allegations in Paragraph 191 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

192. *The MPRA provides:*

> *Each physician, health care provider, health services corporation and insurance company shall refrain from disclosing the nature or details of services provided to patients, except that such information may be disclosed: (1) to the patient, (2) to the party making treatment decisions if the patient is incapable of making*

> *decisions regarding the health services provided, (3) for treatment in accordance with 45 CFR 164.501 and 164.506, (4) for payment in accordance with 45 CFR 164.501 and 164.506, (5) to those parties responsible for peer review, utilization review, and quality assurance, (6) for health care operations in accordance with 45 CFR 164.501 and 164.506, (7) to those parties required to be notified under the Abused and Neglected Child Reporting Act or the Illinois Sexually Transmissible Disease Control Act, or (8) as otherwise permitted, authorized, or required by State or federal law. This right may be waived in writing by the patient or the patient's guardian or legal representative, but a physician or other health care provider may not condition the provision of services on the patient's, guardian's, or legal representative's agreement to sign such a waiver.*

*410 Ill. Comp. Stat. 50/3(d).*

**Response:** The allegations in Paragraph 192 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

193. *Furthermore, the Illinois Personal Information Protection Act ("IPIPA") protects Plaintiffs' and Class Members' Medical Information and Personal Information from unauthorized disclosure. 815 Ill. Comp. Stat. 530/5, /45.*

**Response:** The allegations in Paragraph 193 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

194. *Defendant is a "Data Collector" and subject to the provisions of the IPIPA. See 815 Ill. Comp. Stat. 530/5.*

**Response:** The allegations in Paragraph 194 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

195. *The IPIPA provides that:*

> *A data collector that owns or licenses, or maintains or stores but does not own or license, records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure.*

*815 Ill. Comp. Stat. 530/459(a).*

**Response:** The allegations in Paragraph 195 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

196. *Defendant's Disclosure of Plaintiffs' and Class Members' Private Information to third parties, including Facebook, Google, and DoubleClick, the Trade Desk, Frequence and possibly others, through the operation of the Pixel on its Website and Online Platforms violated Plaintiffs' and Class Members' rights to privacy and confidentiality in their receipt of healthcare services and fell below the applicable standard for safeguarding the confidential Private Information of Plaintiff and the Class Members.*

**Response:** The allegations in Paragraph 196 only concern claims which were dismissed by the Court and therefore no response is required. To the extent any response is deemed required, Defendant denies the allegations.

197. *At all times when Plaintiffs and Class Members provided their Private Information to Defendant, they had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.*

**Response:** Defendant denies the allegations in Paragraph 197.

198. *Defendant also disclosed Plaintiffs' and Class Members' IP addresses to Facebook and others through its use of the Meta Pixel and other tracking technologies.*

**Response:** Defendant denies the allegations in Paragraph 198.

199. *An IP address is a number that identifies the address of a device connected to the Internet.*

**Response:** Defendant denies the allegations in Paragraph 199.

200. *IP addresses are used to identify and route communications on the Internet.*

**Response:** Defendant denies the allegations in Paragraph 200.

201. *IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party trackers to facilitate and track Internet communications.*

**Response:** Defendant denies the allegations in Paragraph 201.

202. *Facebook tracks every IP address ever associated with a Facebook user.*

**Response:** Defendant denies the allegations in Paragraph 202.

203. *Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.*

**Response:** Defendant denies the allegations in Paragraph 203.

204. *Under HIPAA, an IP address is Personally Identifiable Information:*

- *HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code," specifically listing IP addresses as an example of PII. See 45 C.F.R. § 164.514 (2).*

- *HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); See also, 45 C.F.R. § 164.514(b)(2)(i)(O).*

**Response:** Defendant denies the allegations in Paragraph 204.

205. *Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.*

**Response:** Defendant denies the allegations in Paragraph 205.

206. *The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was to enhance its marketing efforts and increase its profits.*

**Response:** Defendant denies the allegations in Paragraph 206.

207. *In exchange for disclosing the Private Information of its patients, Defendant was compensated by Facebook and likely others in the form of enhanced advertising services and more cost-efficient marketing.*

**Response:** Defendant denies the allegations in Paragraph 207.

208. *Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.*

**Response:** Defendant denies the allegations in Paragraph 208.

209. *By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.*

**Response:** Defendant denies the allegations in Paragraph 209.

210. *The data concerning Plaintiffs' and Class Members, collected and shared by Defendant, has tremendous economic value. Data collected via the Meta Pixel, CAPI, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."*[78] *Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.*[79] *Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."*[80]

**Response:** Defendant denies the allegations in Paragraph 210.

211. *Plaintiffs had a recognizable property interest in their browsing history. That browsing history has economic value, and by sharing, or facilitating the sharing of, such information with third parties such as Google and Facebook without prior approval, KSB took something of value from Plaintiffs and provided it to third parties without compensating Plaintiffs for the use of their Private Information and data, thus, causing the Plaintiffs economic injury.*

**Response:** Defendant denies the allegations in Paragraph 211.

212. *Plaintiffs' Private Information, which was taken by Defendant without permission, had value even though it was not "for sale." The browsing history and data mined from individuals using the internet has significant economic value. If it did not have value, then entire industries that sell and trade this data would not exist. There is an entire data industry and estimates suggests that that industry generates billions of dollars.*

**Response:** Defendant denies the allegations in Paragraph 212.

213. *Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.*[81]

**Response:** Defendant denies the allegations in Paragraph 213.

214. *This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per*

---

[78] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting
[79] *Id.*
[80] *See* How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Center, https://www.facebook.com/business/help/465262276878947
[81] *See* Here's How Big Facebook's Ad Business Really Is, CNN, https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html

*American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.*

**Response:** Defendant denies the allegations in Paragraph 214.

215. *In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, it described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.*[82]

**Response:** Defendant denies the allegations in Paragraph 215.

216. *Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."*[83]

**Response:** Defendant denies the allegations in Paragraph 216, which purports to summarize a journalistic report, and denies that Plaintiffs are entitled to any relief based on the report or Plaintiffs' characterization thereof.

217. *The applicable statutes of limitation have been tolled as a result of KSB's knowing and active concealment and denial of the facts alleged herein.*

**Response:** Defendant denies the allegations in Paragraph 217.

218. *KSB seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing patients with no indication that their Website usage was being tracked and transmitted to third parties. KSB knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiffs and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.*

**Response:** Defendant denies the allegations in Paragraph 218.

219. *Even while exercising due diligence, Plaintiffs and Class Members could not have discovered the full scope of KSB's conduct, because there were no disclosures or other indications that they were interacting with websites employing Meta Pixel or any other tracking technology.*

**Response:** Defendant denies the allegations in Paragraph 219.

---

[82] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017 at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.

[83] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019 at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

220. *All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. KSB's illegal interception and disclosure of Plaintiffs' Private Information has continued unabated through the present. What is more, KSB was under a duty to disclose the nature and significance of their data collection practices but did not do so. KSB is therefore, is estopped from relying on any statute of limitations defenses.*

**Response:** Defendant denies the allegations in Paragraph 220.

221. *Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of other similarly situated persons.*

**Response:** Defendant denies the allegations in Paragraph 221.

222. *The Nationwide Class that Plaintiffs seek to represent is defined as follows:*

***All patients of Defendant whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.***

**Response:** Defendant denies the allegations in Paragraph 222.

223. *Further, Plaintiffs seek to represent an Illinois Subclass, defined as:*

***All patients of Defendant who are Illinois citizens and whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.***

**Response:** Defendant denies the allegations in Paragraph 223.

224. *The Nationwide Class and Illinois Subclass are collectively referred to as "the Class."*

**Response:** Defendant denies the allegations in Paragraph 224.

225. *Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.*

**Response:** Defendant denies the allegations in Paragraph 225.

226. *Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.*

**Response:** Defendant denies the allegations in Paragraph 226.

227. *This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).*

**Response:** Defendant denies the allegations in Paragraph 227.

228. *Numerosity: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly accessed in the Disclosure, and each Class is apparently identifiable within Defendant's records.*

**Response:** Defendant denies the allegations in Paragraph 228.

229. *Commonality: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include*

a. *whether and to what extent Defendant had a duty to protect Plaintiffs' and Class Members' Private Information;*

b. *whether Defendant had duties not to disclose the Plaintiffs' and Class Members' Private Information to unauthorized third parties;*

c. *whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for non-healthcare purposes;*

d. *whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for unauthorized purposes;*

e. *whether Defendant failed to adequately Plaintiffs' and Class Members' Private Information;*

f. *whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;*

g. *whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;*

h. *whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;*

i. *whether Defendant's conduct breached its duties of care and amounts to negligence;*

j. *whether Defendant was negligent per se;*

k. *whether Defendant breached its implied contract with Plaintiffs and the Class Members; or in the alternate, whether Defendant was unjustly enriched;*

*l. whether Defendant's conduct violated the Illinois Eavesdropping Statute, 720 Ill. Comp. Stat. 5/14, et seq.;*

*m. whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), et seq.;*

*n. whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)(a) ("Unauthorized Divulgence By Electronic Communications Service");*

*o. whether Defendant's conduct violated Title II of the Electronic Communications Privacy Act, 18 U.S.C. § 2702, et seq.;*

*p. whether Defendant's conduct violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq.*

*q. whether Plaintiffs and the Class Members are entitled to damages, including actual, compensatory, and nominal damages;*

*r. the measure of Plaintiffs' and the Class Members' damages; and,*

*s. whether Plaintiffs and the Class Members are entitled to punitive damages*

**Response:** Defendant denies the allegations in Paragraph 229. Subsections (j), (k) as pertaining to breach of implied contract, (l), and (p) only concern claims which were dismissed by the Court and therefore no response is required.

230. *Typicality: Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.*

**Response:** Defendant denies the allegations in Paragraph 230.

231. *Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.*

**Response:** Defendant denies the allegations in Paragraph 231.

232. *Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or*

*adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.*

**Response:** Defendant denies the allegations in Paragraph 232.

233. *Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.*

**Response:** Defendant denies the allegations in Paragraph 233.

234. *The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.*

**Response:** Defendant denies the allegations in Paragraph 234.

235. *The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.*

**Response:** Defendant denies the allegations in Paragraph 235.

236. *Adequate notice can be given to Class Members directly using information maintained in Defendant's records.*

**Response:** Defendant denies the allegations in Paragraph 236.

237. *Unless a Class-wide injunction is issued, Defendant may continue in their unlawful disclosure and failure to properly secure the Private Information of Class Members, Defendant*

*may continue to refuse to provide proper notification to Class Members regarding Disclosure, and Defendant may continue to act unlawfully as set forth in this Complaint.*

**Response:** Defendant denies the allegations in Paragraph 237.

238. *Further, Defendant have acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.*

**Response:** Defendant denies the allegations in Paragraph 238.

239. *Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:*

a. *whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;*

b. *whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;*

c. *whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;*

d. *whether Defendant was negligent and/or negligent per se;*

e. *whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that contract;*

f. *whether Defendant breached the contract;*

g. *in the alternate, whether Defendant was unjustly enriched;*

h. *whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information had been used and disclosed to third parties;*

i. *whether Defendant failed to implement and maintain reasonable security procedures and practices;*

j. *whether Defendant violated the Illinois Eavesdropping Statute, 720 Ill. Comp. Stat. 5/14, et seq.;*

k. *whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1), et seq.;*

*l. whether Defendant's conduct violated the Electronic Communications Privacy Act, 18 U.S.C. § 2511(3)(a) ("Unauthorized Divulgence By Electronic Communications Service");*

*m. whether Defendant's conduct violated Title II of the Electronic Communications Privacy Act, 18 U.S.C. § 2702, et seq.;*

*n. whether Defendant's conduct violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq.; and,*

*o. whether Plaintiffs and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.*

**Response:** Defendant denies the allegations in Paragraph 239. Subsections (d), (e), (f), (j), and (n) only concern claims which were dismissed by the Court and therefore no response is required.

## COUNT I
## NEGLIGENCE

240. *Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.*

**Response:** Defendant incorporates its responses to the above paragraphs as if fully set forth herein.

241. *Defendant owed to Plaintiffs and Class Members a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.*

**Response:** Defendant denies the allegations in Paragraph 241.

242. *Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.*

**Response:** Defendant denies the allegations in Paragraph 242.

243. *Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private*

*Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiffs' and Class Members' Private Information.*

**Response:** Defendant denies the allegations in Paragraph 243.

244. *Defendant's duty arose as a result of industry standards and the physician-patient relationship to keep patient's Private Information, PHI and PII of Plaintiffs and the Class Members, gathered in that relationship secret; as well as due to Defendant collecting Private Information from patients online*

**Response:** Defendant denies the allegations in Paragraph 244.

245. *Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.*

**Response:** Defendant denies the allegations in Paragraph 245.

246. *Defendant breached its duties and was negligent by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of Private Information of Plaintiffs and Class Members, and by failing to disclose Defendant was gathering Private Information, including PHI and PII, and sharing it with third parties without authorization, beyond the scope of the physician-patient relationship. These failures actually and proximately caused Plaintiffs' and Class Members' injuries.*

**Response:** Defendant denies the allegations in Paragraph 246.

247. *As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.*

**Response:** Defendant denies the allegations in Paragraph 247.

248. *Defendant's breach of its common-law duties to exercise reasonable care and negligence, directly and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of their Private Information by third parties; improper disclosure of their Private Information; receipt of targeted advertisements reflecting private medical information; lost benefit of their bargain; lost value of their Private Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of their information, as to targeted advertisements that resulted from and were caused by Defendant's negligence; value to Plaintiffs and the Class Members of surrendering their choices to keep their Private Information private and allowing Defendant to track their data; increased risk of future harm resulting from future use and disclosure of Plaintiffs' and the Class Members'*

*Private Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.*

**Response:** Defendant denies the allegations in Paragraph 248.

249. *Moreover, Plaintiffs' and the Class Members' foregoing personal injury and property damage was a sudden and dangerous occurrence because Plaintiffs and the Class entrusted their Private Information to Defendant within the scope the physician-patient relationship with the expectation that information would be kept confidential, and yet KSB suddenly, and without warning, disclosed that Private Information to others outside of the physician-patient relationship, without Plaintiffs' and the Class Members knowledge, consent, or authorization.*

**Response:** Defendant denies the allegations in Paragraph 249.

250. *Defendant's negligence directly and proximately caused the unauthorized access and Disclosure of Plaintiffs' and Class Members' Private Information, PII and PHI, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual and compensatory damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.*

**Response:** Defendant denies the allegations in Paragraph 250.

251. *Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.*

**Response:** Defendant denies the allegations in Paragraph 251.

**COUNTS II, III, AND IV**
**NEGLIGENCE *PER SE;* BREACH OF EXPRESS CONTRACT;**
**BREACH OF IMPLIED CONTRACT**

252. **Response:** The allegations in Paragraphs 252 through 286 only concern claims which were dismissed by the Court and therefore no response is required.

**COUNT V**
**UNJUST ENRICHMENT**

287. *Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.*

**Response:** Defendant incorporates its responses to the above paragraphs as if fully set forth herein.

288. *This claim is pleaded in the alternative to Plaintiffs' breach of implied contract claim.*

**Response:** Defendant admits that Plaintiffs plead this claim in the alternative to their breach of implied contract claim, which was dismissed by the Court.

289. *Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information—Private Information—that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with third parties.*

**Response:** Defendant denies the allegations in Paragraph 289.

290. *Plaintiffs and Class Members would not have used Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.*

**Response:** Defendant denies the allegations in Paragraph 290.

291. *Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.*

**Response:** Defendant denies the allegations in Paragraph 291.

292. *As a result of Defendant's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy practices and procedures that Plaintiffs and Class Members paid for, and those purchases with unreasonable data privacy practices and procedures that they received.*

**Response:** Defendant denies the allegations in Paragraph 292.

293. *The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Petition.*

**Response:** Defendant denies the allegations in Paragraph 293.

294. *Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein.*

**Response:** Defendant denies the allegations in Paragraph 294.

**COUNTS VI, VII**
**BAILMENT; ILLINOIS EAVESDROPPING STATUTE,**
**720 Ill. Comp. Stat. 5/14, *et seq.***

295. **Response:** The allegations in Paragraphs 295 through 325 only concern claims which were dismissed by the Court and therefore no response is required.

**COUNT VIII**
**THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1), *et seq.***

326. *Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.*

**Response:** Defendant incorporates its responses to the above paragraphs as if fully set forth herein.

327. *The ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.*

**Response:** Defendant denies the allegations in Paragraph 327. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

328. *The transmissions of Plaintiffs' and Class Members' Private Information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).*

**Response:** Defendant denies the allegations in Paragraph 328.

329. ***Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,...data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).*

**Response:** Defendant denies the allegations in Paragraph 329.

330. ***Content****. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." See 18 U.S.C. § 2510(8).*

**Response:** Defendant denies the allegations in Paragraph 330. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

331. ***Interception****. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." See 18 U.S.C. § 2510(4), (8).*

**Response:** Defendant denies the allegations in Paragraph 331. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

332. ***Electronic, Mechanical or Other Device****. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):*

*a. Plaintiffs' and Class Members' browsers;*

*b. Plaintiffs' and Class Members' computing devices;*

*c. Defendant's web-servers; and*

*d. Defendant's Website.*

**Response:** Defendant denies the allegations in Paragraph 332.

333. *The tracking technology deployed by Defendant effectuated the sending and acquisition of patient communications.*

**Response:** Defendant denies the allegations in Paragraph 333.

334. *By utilizing and embedding the tracking technology on its Website, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).*

**Response:** Defendant denies the allegations in Paragraph 334.

335. *Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the tracking technology including the Pixel, which tracked, stored ,and unlawfully disclosed Plaintiffs' and Class Members' Private Information to Facebook, Google, DoubleClick, the Trade Desk, and Frequence.*

**Response:** Defendant denies the allegations in Paragraph 335.

336. *Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding Private Information, and medical treatment.*

**Response:** Defendant denies the allegations in Paragraph 336.

337. *By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).*

**Response:** Defendant denies the allegations in Paragraph 337.

338. *By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).*

**Response:** Defendant denies the allegations in Paragraph 338.

339. ***Unauthorized Purpose.*** *Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.*

**Response:** Defendant denies the allegations in Paragraph 339.

340. *Defendant intentionally used the wire or electronic communications to increase its profit margins and save on marketing costs.*

**Response:** Defendant denies the allegations in Paragraph 340.

341. *Defendant specifically used the Pixel to track and to utilize Plaintiffs' and Class Members' Private Information for financial gain.*

**Response:** Defendant denies the allegations in Paragraph 341.

342. *Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.*

**Response:** Defendant denies the allegations in Paragraph 342.

343. *Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy via the tracking technology.*

**Response:** Defendant denies the allegations in Paragraph 343.

344. *In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of its Website, Defendant's purpose was tortious, criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of HIPAA, the FTC Act, invading Plaintiffs and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.*

**Response:** Defendant denies the allegations in Paragraph 344.

## COUNT IX
## THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA") 18 U.S.C. § 2511(3)(a) UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE

345. *Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.*

**Response:** Defendant incorporates its responses to the above paragraphs as if fully set forth herein.

346. *The ECPA statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).*

**Response:** Defendant denies the allegations in Paragraph 346. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

347. ***Electronic Communication Service***. *An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or*

*electronic communications." 18 U.S.C. § 2510(15). Defendant's Website is an electronic communication service which provides to users thereof, patients of Defendant, the ability to send or receive electronic communications; in the absence of Defendant's Website, internet users could not send or receive communications regarding Plaintiffs' and Class Members' Private Information.*

**Response:** Defendant denies the allegations in Paragraph 347.

348. ***Intentional Divulgence***. *Defendant intentionally designed the tracking technology and was or should have been aware that, if so configured, it could divulge Plaintiffs' and Class Members' Private Information. Upon information and belief, Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications was contemporaneous with their exchange with Defendant's Website, to which they directed their communications.*

**Response:** Defendant denies the allegations in Paragraph 348.

349. *Defendant divulged the contents of Plaintiffs' and Class Members' electronic communications without authorization and/or consent.*

**Response:** Defendant denies the allegations in Paragraph 349.

350. ***Exceptions do not apply***. *In addition to the exception for communications directly to an electronic communications service ("ECS")*[84] *or an agent of an ECS, the ECPA states that "[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication."*

a. *"as otherwise authorized in section 2511(2)(a) or 2517 of this title;*

b. *"with the lawful consent of the originator or any addressee or intended recipient of such communication;" c. "to a person employed or authorized, or whose facilities are used, to forward such communication to its destination;" or d. "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency." U.S.C. § 2511(3)(b).*

**Response:** Defendant denies the allegations in Paragraph 350.

351. *Section 2511(2)(a)(i) provides: It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a*

---

[84] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

*provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.*

**Response:** Defendant denies the allegations in Paragraph 351. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

352. *Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications to Facebook was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of Defendant's service nor (ii) necessary to the protection of the rights or property of Defendant.*

**Response:** Defendant denies the allegations in Paragraph 352.

353. *Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.*

**Response:** Defendant denies the allegations in Paragraph 353.

354. *Defendant's divulgence of the contents of Plaintiffs' and the Class Members' patient user communications on its Website through the tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiffs and Class Members were exchanging information.*

**Response:** Defendant denies the allegations in Paragraph 354.

355. *Moreover, Defendant divulged the contents of Plaintiffs' and Class Members' communications through the Pixel code to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."*

**Response:** Defendant denies the allegations in Paragraph 355.

356. *The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.*

**Response:** Defendant denies the allegations in Paragraph 356.

357. *As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be*

*appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.*

**Response:** Defendant denies the allegations in Paragraph 357.

**COUNT X**
**TITLE II OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("STORED COMMUNICATIONS ACT")**
**18 U.S.C. § 2702, *et seq.***

358. *Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.*

**Response:** Defendant incorporates its responses to the above paragraphs as if fully set forth herein.

359. *The ECPA further provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).*

**Response:** Defendant denies the allegations in Paragraph 359. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

360. ***Electronic Communication Service**. ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant intentionally procures and embeds various Plaintiffs' and Class Members' patient Private Information through the tracking technology used on Defendant's Website, which qualifies as an Electronic Communication Service.*

**Response:** Defendant denies the allegations in Paragraph 360.

361. ***Electronic Storage**. ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).*

**Response:** Defendant denies the allegations in Paragraph 361. To the extent the allegations in this Paragraph purport to quote, summarize, or characterize any statute, regulation, bulletin, or

rule, Defendant denies any allegation inconsistent with the text thereof and denies that Plaintiffs are entitled to any relief under said cited authority.

362. *Defendant stores the content of Plaintiffs' and Class Members' communications on Defendant's Website and files associated with it.*

**Response:** Defendant denies the allegations in Paragraph 362.

363. *When Plaintiffs or Class Members make a Website communication, the content of that communication is immediately placed into storage.*

**Response:** Defendant denies the allegations in Paragraph 363.

364. *Defendant knowingly divulges the contents of Plaintiffs' and Class Members' communications through the tracking technology.*

**Response:** Defendant denies the allegations in Paragraph 364.

365. ***Exceptions Do Not Apply****. Section 2702(b) of the Stored Communication Act provides that an electronic communication service provider "may divulge the contents of a communication—" a. "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." b. "as otherwise authorized in Section 2517, 2511(2)(a), or 2703 of this title;" c. "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;" d. "to a person employed or authorized or whose facilities are used to forward such communication to its destination;" e. "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;" f. "to the National Center for Missing and Exploited Children, in connection with a reported submission thereto under section 2258A." g. "to a law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime;" h. "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency"; or "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies Section 2523."*

**Response:** Defendant denies the allegations in Paragraph 365.

366. *Defendant did not divulge the contents of Plaintiffs' and Class Members' communications to "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of Plaintiffs and Class Members.*

**Response:** Defendant denies the allegations in Paragraph 366.

367. *Section 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.*

**Response:** Defendant denies the allegations in Paragraph 367.

368. *Section 2511(2)(a)(i) provides: It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.*

**Response:** Defendant denies the allegations in Paragraph 368.

369. *Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications on its Website to Facebook or other third parties was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of the Defendant's services nor (ii) necessary to the protection of the rights or property of Defendant.*

**Response:** Defendant denies the allegations in Paragraph 369.

370. *Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.*

**Response:** Defendant denies the allegations in Paragraph 370.

371. *Defendant's divulgence of the contents of Plaintiffs' and Class Members' patient user communications on its Website was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above: (i) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of their communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiffs and Class Members were exchanging information.*

**Response:** Defendant denies the allegations in Paragraph 371.

372. *Moreover, Defendant divulged the contents of Plaintiffs' and Class Members' communications through the tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."*

**Response:** Defendant denies the allegations in Paragraph 372.

373. *The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of their communications to a law enforcement agency.*

**Response:** Defendant denies the allegations in Paragraph 373.

374. *As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.*

**Response:** Defendant denies the allegations in Paragraph 374.

**COUNT XI**
**COMPUTER FRAUD AND ABUSE ACT ("CFAA")**
**18 U.S.C. § 1030, *et seq.***

375. **Response:** The allegations in Paragraphs 375 through 380 only concern claims which were dismissed by the Court and therefore no response is required.

**PRAYER FOR RELIEF**

***WHEREFORE**, Plaintiffs Chloe Noftz, Tonya Black and Kenneth Weinstock, on behalf of themselves and on behalf of all others similarly situated, prays for judgment as follows:*

a. *for an Order certifying this action as a Class action and appointing Plaintiffs as Class Representative and Plaintiffs' counsel as Class Counsel;*

b. *for an award of actual damages, compensatory damages, consequential damages, and punitive damages, in an amount to be determined, as allowable by law;*

c. *for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;*

d. *for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;*

e. *for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;*

f. *for an award of attorneys' fees under the common fund doctrine, and any other applicable law;*

g. *costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;*

h. *pre- and post-judgment interest on any amounts awarded; and*

i. *such other and further relief as this court may deem just and proper.*

**Response:** Defendant denies that Plaintiffs, or any putative class member, is entitled to any of the relief sought in the Prayer for Relief, whether legal, equitable, injunctive, declaratory, monetary, punitive, or otherwise. Defendant specifically denies that Plaintiffs or any putative class member are entitled to certification of any class, to class-wide damages, restitution, disgorgement, penalties, attorneys' fees, costs, interest, or any other form of relief. Defendant further denies that Plaintiff is entitled to declaratory or injunctive relief, including any order directing Defendant to take or refrain from any action.

**JURY DEMAND**

*Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury on all issues so triable.*

**Response:** Defendant admits that Plaintiffs demand a trial by jury, and Defendant also demands a trial by jury on all issues so triable.

**AFFIRMATIVE DEFENSES**

Defendant has not completed its full investigation of the facts of this case, has not completed discovery in this matter, and has not completed its preparation for trial. The defenses asserted herein are based on Defendant's knowledge, information, and belief at this time. By asserting the defenses herein, Defendant does not knowingly and intentionally waive any applicable defenses and hereby expressly reserves the right to assert any additional defenses, cross-claims, and/or third party claims as may be appropriate at a later time. Without assuming any burden of proof, persuasion, or production not otherwise legally assigned to it as to any element of Plaintiffs' claims, Defendant asserts the following defenses:

FIRST AFFIRMATIVE DEFENSE: STATUTE OF LIMITATIONS

Plaintiffs' claims, and the claims of any putative class members, are barred in whole or in part by the applicable statutes of limitations, including but not limited to those arising under federal

and state law. To the extent any alleged conduct occurred outside the governing limitations period, such claims are untimely and cannot be maintained.

SECOND AFFIRMATIVE DEFENSE: STATUTE OF REPOSE

Plaintiffs' claims, and the claims of any putative class members, are barred in whole or in part by one or more applicable statutes of repose, which extinguish any cause of action arising from conduct occurring outside the repose period, regardless of discovery or accrual.

THIRD AFFIRMATIVE DEFENSE: WAIVER

Plaintiffs, and any putative class members, have waived the claims asserted in the Complaint, in whole or in part, by knowingly and voluntarily relinquishing any alleged rights through their conduct, agreements, or failure to act.

FOURTH AFFIRMATIVE DEFENSE: FAILURE TO MITIGATE

Plaintiffs, and any putative class members, failed to mitigate any alleged damages and other possible monetary awards. Any recovery must be reduced or barred to the extent Plaintiffs or putative class members failed to take reasonable steps to avoid or minimize the alleged harm.

FIFTH AFFIRMATIVE DEFENSE: PREEMPTION

Plaintiffs' claims are barred, in whole or in part, by federal preemption. To the extent federal statutes, regulations, or administrative frameworks govern the conduct at issue, they supersede or displace the state law claims asserted in the Complaint.

SIXTH AFFIRMATIVE DEFENSE: GOOD FAITH COMPLIANCE WITH STATUTE

Defendant acted at all times in good-faith compliance with all applicable federal and state statutes, regulations, and administrative guidance. No legislative body or court of law has declared that any of the alleged "tracking technologies" allegedly deployed on the KSB Website to be illegal or unlawful to use. To the extent any statutory scheme or state common law provides a safe harbor,

limitation on liability, or defense for good faith compliance, Defendant is entitled to the benefit of such protections, including but not limited to a complete bar to liability under 18 U.S.C. §§ 2520(d) and 2720(e).

SEVENTH AFFIRMATIVE DEFENSE: UNCLEAN HANDS

To the extent Plaintiffs seek equitable relief, such claims are barred by the doctrine of unclean hands. Plaintiffs' own conduct, and the conduct of any putative class members, was inequitable, wrongful, or inconsistent with the relief sought, thereby precluding equitable remedies.

EIGHTH AFFIRMATIVE DEFENSE: LACHES

Defendant asserts the doctrine of laches as an affirmative defense. Plaintiffs' claims are barred, in whole or in part, because they unreasonably delayed in asserting them, and that delay has materially prejudiced Defendant. Plaintiffs allege that Defendant's website contained the Meta Pixel or other alleged "tracking technologies" and that, at some unspecified point, they purportedly entered personal health information that was allegedly disclosed to a third party. The Complaint contains no allegations identifying when any Plaintiff visited the website, when any Plaintiff allegedly entered any information, or when any alleged disclosure occurred. Plaintiffs' failure to plead any temporal facts demonstrates that they waited an unreasonable and unjustified period before filing suit. During the period of Plaintiffs' unexplained delay, Defendant's ability to investigate and defend against the claims may be significantly prejudiced. Website configurations evolve, analytics tools change, and personnel with relevant knowledge may no longer be available. Plaintiffs' delay may have impaired Defendant's ability to locate historical website data, identify relevant custodians, preserve information, and otherwise mount a full and fair defense. Because

Plaintiffs unreasonably delayed in bringing this action and Defendant has suffered substantial prejudice as a result, Plaintiffs' claims are barred by the doctrine of laches.

NINTH AFFIRMATIVE DEFENSE: STATUTORY DEFENSES

Defendant asserts all available and applicable statutory defenses available within Title 18, Chs. 119 and 121 of the United States Code and all other defenses raised in Counts VIII through X of the Complaint which Plaintiffs contend to do not apply, including but not limited to 18 U.S.C. §§ 2511(2)(a)(i), 2511(2)(d), 2511(3)(b), 2520(d) and 2720(e), as well as any other statutory defenses which relate to Plaintiffs' consent, necessity of actions to protect property rights, actions which are the necessary incident to rendition of services, good faith compliance or reliance, and being a party to the communication. Out of an abundance of caution, Defendant asserts these defenses as affirmative defenses but does not waive or acquiesce any element or burden of proof which Plaintiffs bear.

TENTH AFFIRMATIVE DEFENSE: CONSENT / RATIFICATION

The Complaint and the claims alleged therein are barred, in whole or in part, by the doctrines of consent and/or ratification because Plaintiffs and the putative class members manifested agreement through words and/or conduct to the sharing and/or use of their personal information as alleged in the Complaint. Plaintiffs' claims barred, in whole or in part, to the extent Plaintiffs and the putative class members had notice regarding the information Defendant allegedly intercepted and disclosed about them and they continued to use Defendant's services, and/or failed to diligently pursue their claims.

ELEVENTH AFFIRMATIVE DEFENSE: INTERVENING ACTS OF THIRD PARTIES

Plaintiffs' claims are barred, in whole or in part, by the doctrine of intervening acts and superseding causes. Any alleged disclosure of information was the result of acts, omissions,

configurations, or decisions made by third parties over whom Defendant had no control and for whom Defendant bears no responsibility. To the extent any data associated with Plaintiffs was transmitted, such transmission would have resulted from independent actions taken by third parties, including but not limited to: (i) Plaintiffs' own voluntary interactions with their devices, browsers, or social-media accounts; (ii) third-party platforms, software providers, or analytics tools that Plaintiffs chose to use; (iii) settings, permissions, or integrations controlled solely by those third parties; and (iv) conduct by third parties that altered, modified, or interacted with Plaintiffs' data outside of Defendant's control. Any alleged harm was therefore caused by intervening acts that break any causal chain between Defendant's conduct and Plaintiffs' alleged injuries. Defendant neither directed nor controlled the actions of these third parties, and Defendant could not reasonably foresee or prevent their independent conduct. As a result, Plaintiffs cannot establish that Defendant's actions were the proximate cause of any alleged injury, and their claims are barred by the doctrine of intervening acts and superseding causes.

## TWELFTH AFFIRMATIVE DEFENSE: LACK OF SUBJECT MATTER JURISDICTION UNDER CLASS ACTION FAIRNESS ACT

Out of an abundance of caution, Defendant asserts as an affirmative defense that Plaintiffs' Complaint cannot be pursued as a class action because Plaintiffs have failed to allege minimal diversity under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Out of an abundance of caution, Defendant asserts this as an affirmative defense but does not waive or acquiesce any element or burden of proof which Plaintiffs bear, either initially or upon burden shifting.

WHEREFORE, Defendant KSB Hospital prays that the Court accept this Answer and deny any and all relief sought by Plaintiffs and the putative class, dismiss all claims in the Complaint, and entered judgment in favor of Defendant.

This 1st day of October, 2026.

Respectfully submitted,

***/s/ Sanjay S. Karnik***

Sanjay S. Karnik
Ill. Reg. No. 6300156
Brandi Z. Burton-Murrain
Ill. Reg. No. 6323698

CHILIVIS GRUBMAN, LLP
159 N. Sangamon Street, Suite 313A
Chicago, IL 60607
Tel: (872) 260-6679
Fax: (404) 261-2842
skarnik@cglawfirm.com
bmurrain@cglawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of October, 2026, I have caused the electronic filing of the foregoing document described as **DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES** through the CM/ECF system, which will serve all parties of record.

***/s/ Sanjay S. Karnik***
Sanjay S. Karnik